GEORGE R. NEWELL *vs.* MINNEAPOLIS, LYNDALE & MINNETONKA RAILWAY COMPANY.

April 5, 1886.

Streets—Extent of Public Easement.—The public easement in a public street is the public and common right to use the same for the passage of persons and property, and for purposes incidental to such passage.

Same—Right of Owner of Soil. — The owner of the soil over which a street is laid has the right to insist that a street shall be used for the legitimate purposes of its creation and existence, and in a manner proper to effectuate the same.

Same—Use Infringing Rights of Public—Question of Law.—When a street is being used for the purpose (legitimate in its general nature) of the passage of persons and property, but objection is made to the *mode* of use, the question of *rightfulness* depends upon whether the use objected to is consistent or inconsistent with the common public use in which every person is entitled to share. This question of consistency or inconsistency is a question of law. That is to say, the *facts* of a given case being ascertained, it is for the court to pronounce upon their effect, and to determine whether a manner of using a street complained of is or is not, all things considered, a substantial infringement upon the common public right.

Same—Street Railway—Steam Motor.—*Held*, in the application of the foregoing principles to the particular state of facts found in this case, and given in detail in the opinion, that the use of a public street in the city of Minneapolis by defendant, with the permission of the public authorities, for the construction and operation of its railway, is the use of it in aid of the street as a passenger street railway, and not the imposition upon the soil of the street of a servitude additional to the proper street easement. And this notwithstanding the fact that said railway is operated by steam, and is used for the purpose of transporting persons from its terminus within the city to a point 18 miles outside of the city limits,

as well as for transporting persons from one point in the city to another, and that outside of said limits it is, to some extent, operated as an ordinary commercial railway.

Same — Objection by Land-owner that Use of Street is Ultra Vires of Railway Company.—*Held, further,* that plaintiff, as owner of the soil of the street, having no right to object to defendant's use of the same on the ground that it imposes a servitude additional to the proper street easement, and the defendant being in possession (so far as necessary for the purposes of its railway) of the street with the sanction and acquiescence of the public authorities, the plaintiff is not in a position to object that defendant, in its use of the streets and the operation of its railway, is acting *ultra vires,* or that it is invading the franchise of another corporation.

Appeal by plaintiff from an order of the district court for Hennepin county, *Lochren,* J., presiding, refusing a new trial.

*Hart & Brewer* and *A. L. Levi,* for appellant.

*J. M. Shaw, Gordon E. Cole,* and *Cross, Hicks & Carleton,* for respondent.

BERRY, J. Plaintiff is owner of certain land abutting on a public street in Minneapolis called "First Avenue South," and therefore owner of the fee of the half of the street adjoining his premises, subject to the street easement. As the complaint alleges, defendant— a railway corporation, and assuming to act as such—has wrongfully entered upon plaintiff's portion of the street, and taken possession thereof for its road-bed, laying down ties and rails thereon, and using and continuing in possession thereof for the operation of its railway, all without plaintiff's consent, and without payment of compensation. The plaintiff brings this action in the nature of ejectment for a restitution. In our judgment the case can present but two questions:

1. Is the construction, maintenance, and operation of defendant's railway the imposition upon the soil of First avenue south, adjacent to plaintiff's premises, of a servitude additional to the proper public easement in such street? If this question be answered in the affirmative, the case is at an end, for the additional servitude, (if any there be,) having been imposed upon plaintiff's soil without his consent, and without compensation, he is entitled to put a stop to its continuance. But if the question be answered in the negative, then the

v.35M—8

second question is, can the *plaintiff* object to defendant's use of the street for the purpose of its railway?

To answer the first question it is necessary to consider to some extent the nature of a street easement.   The public easement in a public street is the public and common right to use the same for the passage of persons and things, and for purposes incidental thereto. The exercise of this right is subject, in some degree, to regulations to be made by the proper authorities.   The ownership of the soil on which the street is laid being absolute, subject only to the street easement, the owner has the right to insist that the street shall be used and enjoyed for the legitimate purposes of its creation and existence, and for no others.   As the right of use is public and common, every member of the public, *i. e.*, every person, is entitled to avail himself of it; and hence no person can lawfully monopolize its use, or, what would amount to the same thing, use it so as to exclude any other person from it.

This proposition is, however, not to be understood as trenching upon any right which the public authorities may possess to prescribe the purposes for which a particular street shall be used; as, for instance, for light or heavy traffic, as the case may be.   *How* the monopolizing of the use of a street, or the illegal exclusion of any one from it, is accomplished cannot be important.   They may be effected either by an appropriation or occupation of the entire surface of the street, or by the use of a part of it in such way as to render its legitimate use by others impracticable, and thus practically deprive them of its use altogether.   Thus, for instance, an ordinary railroad, constructed and operated in and along a street, though it is used for the passage of persons and property, and is therefore, so far as this general nature of its business is concerned, using the street for proper street purposes, yet the mode of its construction or operation, or both, are such as to monopolize the street, and virtually and practically exclude the general public from its legitimate use.   So that the use of the street for such railroad is inconsistent with the common and public use of it, in which every person is entitled to share, and hence it is held to be the imposition upon the soil of a servitude differing from, and additional to, that of the proper and lawful street easement.

The case of an ordinary street railway is otherwise. There the street is also used for the passage of persons and property, but in such manner as not substantially to interfere with the common and public right of every person to use the street also; and so the use of a street by such street railway is held not the imposition of an additional servitude. So that when a street is being used for the purpose (legitimate in its general nature) of the passage of persons and property, but objection is made to the *mode* of use, the question of rightfulness depends upon whether the use objected to is consistent or inconsistent with the common public use, in which every person is entitled to share.

This question of consistency or inconsistency is a question of law; that is to say, the *facts* of a given case being ascertained, it is for the court to pronounce upon their effect, and to determine whether a manner of using a street complained of is or is not, all things considered, a substantial infringement upon the common public right. We say a *substantial infringement, all things considered,* because it is not every mere inconvenience or temporary hinderance to which one person, in using a street, may be subjected by the manner in which another uses it, which presents a case of inconsistency with the common public right. The inconsistency must be such that the common public use cannot, in its substantial integrity, co-exist with the use complained of. If the existence of the latter is inconsistent with the substantial integrity of the former, then the latter cannot stand as a proper and lawful use of the street easement. If the use complained of is such that the public and common right of passage of persons and things cannot be enjoyed without substantial impairment on account of the *manner* of such use, then it is inconsistent with the public and common right, and not a proper and lawful use of the easement of the street. But no merely technical or trifling interruption or obstruction is to be regarded as a substantial impairment, for common sense requires that these words should receive a reasonable and liberal construction, and it must always be borne in mind that in organized civil society the individual must necessarily enjoy a common public right with reference to the general convenience and the rights of others. The foregoing rules and principles are, in our judgment,

fully supported, either directly or by logical deduction, by *Carli* v. *Stillwater St. Ry. Co.*, 28 Minn. 373, (10 N. W. Rep. 205,) and the authorities there cited.

It remains to apply them to the facts of this case as found by the court below to exist when this action was commenced, which, so far as deemed material for this purpose, are as follows: At the time when this action was commenced defendant's railway extended from near the westerly end of the suspension bridge, a central place in the city of Minneapolis, for a distance of one and a half to two miles within the city limits; thence, via Lakes Calhoun and Harriet, for a further distance of about 18 miles to Lake Minnetonka. Defendant's line of railway is a single track of three-feet gauge, (with occasional turn-outs,) and so laid with a light T rail that the top of the rail conforms to the surface grade of the street or roadway, and so planked at the sides of the rails, and filled and graded between the rails, that the track does not interfere with the passage of vehicles, or with any use of the highway, more than do the flat rails, well laid, of the ordinary horse railroad. The passenger cars are from 34 to 37 feet long, and so constructed that travellers can readily step on or off the same to or from the street or road. Within the city, and as far out as Lake Calhoun, they are drawn, either singly or in trains of from two to four cars, and, on rare occasions, in greater number than four cars, by Baldwin motors, which are small steam-engines entirely encased in cabs, so that no part of the machinery is visible from the outside, and from 19 to 21 feet long, having the appearance of a short car, except that a smoke-pipe about nine inches in diameter stands a foot or more above the top of the cab. No bell or whistle is used. The steam is exhausted in the engine. Anthracite coal is used for fuel, making little or no smoke, and neither smoke nor steam is often perceptible. Between Lakes Calhoun and Minnetonka a narrow-gauge locomotive engine is used to draw some trains, and some are drawn by the motors. Six trips or more each way per day have been regularly made between the city terminus of the railway and Lake Calhoun, but a less number between Lakes Calhoun and Minnetonka. The cars are moved along First avenue south, past plaintiff's land, and through all the closely-settled portion of the city, at a speed of

three to four miles an hour, and are furnished with air-brakes, and can be stopped in the distance of from two to six feet. Between the closely-settled portions of the city and Lake Calhoun the speed is greater, reaching six miles an hour, and between Lakes Calhoun and Minnetonka it is increased in some places to 15 miles an hour or more. There are no depots, stations, or platforms connected with said railway, but within the city, and as far out as Lake Calhoun, the passengers are taken on and let off along the street, and at street crossings, whenever they choose, as is customary on street railways. The uniform fare for passengers within the city limits, as existing when this action was brought, has been five cents, with the same fare for persons residing near the line of the railway as far out as Lake Calhoun. Higher rates of fare for other persons travelling between the city and the lakes, and between the lakes or points outside of said city limits, have been fixed and received. Between Lakes Calhoun and Minnetonka the cars stop to take up and discharge passengers at any highway crossing. Within the city, as bounded when this action was commenced, defendant's railway has been operated solely for the carriage of passengers, and a large share of its business and income has arisen from passengers carried thereon from point to point, as they might desire, along the streets traversed by said railway. In the warm season it also carries many passengers, gathered up along such streets, to said lakes and back again, such lakes being suburban resorts, frequented in such seasons by inhabitants of, and sojourners in, said city. Between Lake Minnetonka and a point near, but outside, the recent boundary of the city, said railway has carried some cord-wood and other freight.

These are, in substance, the facts found by the trial court upon the branch of this case now under consideration, and upon them our decision must be based, for they are supported by the evidence; and if it be true that upon any particular point or points the evidence would warrant fuller or other findings, that defect (if it exist) should have been remedied upon a motion to correct the findings before bringing the case to this court.

Upon its findings of fact the trial court was of opinion, and so found, as conclusions of law, (2) that defendant's railway, as con-

structed and operated on First avenue south, and elsewhere within the limits of the city as bounded when this action was commenced, was and is a passenger street railway, and this character is not changed by the fact that between some point outside of said city limits and Lake Minnetonka it ceases to be a passenger street railway; (3) that the construction and operation of said railway partly on that part of First avenue south of which the "ultimate fee" is in the plaintiff does not constitute any additional burden or servitude beyond the public easement contemplated in the dedication of the street, nor any taking or appropriation of the property of the plaintiff as owner of the fee.

Both of these conclusions are, in our judgment, correct.

The first clause of the first, viz., that defendant's railway is a passenger street railway, is in effect a finding that its use consists in the transfer of persons along or over the streets within the city, and would seem to be a mere result or summing up of the previous findings of fact upon that subject, and it is therefore, perhaps, quite as much in the nature of a conclusion of fact as a conclusion of law. It is enough to say in regard to it that it is the legitimate result of the previous findings of fact. The last clause of this conclusion, viz., that this character of the railway is not changed by the fact that at some point outside of the city it ceases to be a passenger street railway, is right as a conclusion of law. If it is, in fact, a passenger street railway within the city limits, how can it become anything else *there* because it becomes something else elsewhere? A person who desires to go from any part of Minneapolis to San Francisco has the same right to use the streets of the former city for the purpose of passing out of it on his way to his destination as a person who simply desires to pass from one place in Minneapolis to another in the same city. The use of the streets is just as legitimate, and just as clearly and completely a lawful and proper enjoyment of the public and common easement, in the one case as in the other.

Take the case of an old-fashioned stage line taking its passengers from its station, say at the Nicollet House, in Minneapolis, and conveying them to Shakopee, would it ever occur to any one that the use for that purpose of the streets of Minneapolis as far as they extended on

the way would not be entirely legitimate, and entirely within the purposes of dedication, because the streets used were only a part, and small part, of the entire route of the line, and the line was run exclusively for the purpose of conveying persons to and from places outside of the city of Minneapolis? Or is it any objection to the use of a street by a horse railway that the line extends into the country, and carries passengers accordingly? Such illustrations as these, (and they could be multiplied indefinitely,) as it seems to us, demonstrate the correctness of the conclusion arrived at by the trial court which we are now considering. It cannot be that a proper use of the streets of a city can be made improper by the fact that the instrumentalities through which that use is enjoyed are changed, as respects their mode of operation, after the city boundaries are passed over, or that the use of the streets of a city for the purpose of going out of it, or of coming into it, can be improper or illegitimate, or in any sense the imposition of a servitude additional to the ordinary street easement.

The other conclusion of law, viz., that the construction and operation of defendant's railway does not impose any additional servitude, etc., has given us more trouble; for while the previous finding that defendant's railway is, within the city limits, a passenger street railway may be true in the sense that it is *there* a railway used and operated exclusively, or substantially so, for the transportation of passengers from one part of the city to another, still that fact alone and by itself would not materially distinguish it from what is styled by counsel an ordinary "commercial railway," used exclusively to bring passengers into, or carry them out of, the city. Yet this ordinary commercial road (so called) has been held by this court, in several cases, as well as by a majority of the courts in other states, to impose a servitude additional to the ordinary street easement, and therefore to infringe the rights of the owner of the soil over which the street is laid. It is otherwise, however, with the ordinary horse street railway. Where, then, is the distinction? Both are used for the conveyance of persons from one part of the city to another, and in that sense both are street railways, and both operated in aid of the street, to facilitate the passage of persons over the same. We think the answer to the question is

found in the general rules and principles laid down, and to some extent expounded, in the early part of this opinion.

A railway upon a street, engaged in carrying persons and things over the same, whether from one point to another on such street or in the city, or from points inside to those outside, or *vice versa*, is or is not rightfully using the street, (with, of course, the sanction of the proper authorities,) according as its use is or is not consistent with the common public use of the street, in which every person is entitled to share. Now, whatever facts may *exist* in this case, or whatever facts may have been shown which are not embraced in any finding, there is nothing in the findings of fact from which it can be inferred, as a conclusion of law, that defendant's use of the street, in constructing, maintaining, or operating its railway, is inconsistent with the common public use; nothing to show that the two uses may not co-exist without any substantial infringement or interruption of the latter by the former. While, so far as construction and maintenance are concerned, the facts are expressly found that the surface of the street is not essentially changed or disturbed, there is no fact found showing that the operation of defendant's railway seriously jeopardizes or interferes with the safety and security or convenience, as respects either person or property, of any one who desires to avail himself of the public and common right of user. It may well be that defendant's railway *could* be so operated, even as a purely passenger street railway, as substantially to interfere with, if not to put a practical end to, the use of the street by the general public. It is not impossible to conceive that any ordinary horse street railway could be operated with like effect. Suppose, for instance, that a horse railway were permitted to occupy the entire breadth of a street with its tracks, and to run its cars at the rate of one in one or two minutes, what would be the value of the ordinary street·easement in such a state of facts? This illustration is, as it seems to us, in point for the purpose of showing that the *manner and effect* of operating a street railway are the tests of its rightfulness; and while the manner and effect of operating defendant's railway *might* have been such as to interfere substantially with the public and common right, the findings do

not show that it was so in this case, which, as it is important to bear in mind, was tried with reference to the state of facts set up in the pleadings as subsisting at the time when this action was commenced.

The railway in question in *Carli* v. *Stillwater St. Ry. Co., supra,* was neither more nor less than a connecting link between two ordinary (so-called) commercial railways.   The effect was the same as if one of these railways had been extended over it to a junction with the other, so that the railway in that case was really and in effect an ordinary "commercial railway," and in no sense, "in aid of the street."   Upon this ground the opinion and determination in that case proceeded, holding, under the decisions of this court, and in accordance with the view prevalent elsewhere, that as such ordinary commercial railway it imposed a servitude upon the street additional to the proper street easement.   But the defendant's railway is a different thing, and clearly *in aid of the streets* over which it runs.   It takes on and discharges passengers at any street crossing upon its line, as does an ordinary horse railway; and this practice applies as well to those who get on for the purpose of going out of the city or of coming into it, as to those who get on and also get off within the city limits.   Such a railway is in aid of the street because it facilitates the passage of persons over the street, enabling them, in large numbers, to pass over it with far less noise, trouble, and expense than if each should pass on foot or in an ordinary vehicle, and without, so far as this case shows, any substantial interference with the public and common right of passage.

Upon all these considerations we therefore conclude that defendant's railway was, within the city, properly a street railway; and that its construction, maintenance, and operation do not impose upon plaintiff's soil a servitude additional to that of the ordinary street easement, so as to make defendant's use of the street unlawful without compensation to plaintiff.

2. Having thus answered the first main question presented in this case in the negative, we are brought to consider the second, viz.: Can the *plaintiff* object to the defendant's use of the street (in the manner found by the trial court) for the purposes of its railway? We say whether the *plaintiff* can object, because if he cannot it makes

no difference *in this action* whether defendant *has in fact* any legal right to construct, maintain, and operate its railway on First avenue south or not.   The plaintiff having, as we have seen, no right to object on the ground that defendant's use of the street imposes a servitude additional to the proper street easement, his objection, if any, must be that defendant is not authorized to use the street easement in the way in which it does.   The charter of the city of Minneapolis commits the care, supervision, and control of the streets to the common council.   By ordinances passed March 22, 1882, before this action was commenced, (in November, 1882,) and subsequently, the council gave defendant permission to operate its railway, and with steam-power, on First avenue south, and other streets, to June 1, 1883, a date subsequent to the trial of this action.   As a result of this, and of the conclusion arrived at upon the first branch of the case, the defendant was in fact lawfully in its possession (such as it was) and use of the street, so far as the public authorities were concerned.   It had, at least, their license and acquiescence in its favor.

But it seems that by an ordinance of July 9, 1875, a corporation denominated the Minneapolis Street Railway Company was granted the exclusive right, subject to conditions not here important, of constructing and operating street railways in the city of Minneapolis, in such streets as the city council may deem suited to that purpose; and by ordinances of July 3 and 8, 1878, said "company, its successors and assigns," were authorized, upon similar conditions as above, to construct and maintain a street railway line on First avenue south, and other streets, (being the route of defendant's railway;) and "to operate such line of railway with animal, steam, or other power," the right to prohibit the use of steam when the public good required being reserved.   On October 24, 1878, the Minneapolis Street Railway Company and the defendant, pursuant to authority given by their respective boards of directors, formally entered into a written contract, whereby, among other things, and for a sufficient consideration, the street railway company leased to the latter, for 43 years, its rights and franchises to the use, for suburban railway purposes, of First avenue south and said other streets, and the lease was duly recorded, November 17, 1878.   Immediately upon the execution of this con-

tract defendant entered upon First avenue south and the other streets mentioned, and, at large expense, constructed thereon its railway, which it has ever since maintained and operated, no other railway having been constructed on that route.

Now, upon this state of facts, and with reference to the conclusion arrived at upon the first branch of this case, both the public authorities and the street railway company appear to acquiesce in and sanction defendant's use of the streets. It matters not whether defendant is acting strictly within the terms of its charter or of the so-called lease from the street railway. It is *there upon the ground,* in actual possession (so far as necessary) and use of the streets. Whether it is there as a corporation, association, or partnership, whether in the exercise of its lawful corporate franchises, or *ultra vires,*—so long as its use of the streets is a proper street use, under sanction of public authority,—the *plaintiff* cannot complain. If the exclusive franchise of the street railway company is invaded, either because the so-called lease is unauthorized and void as a lease, because executed without proper authority, or because the rights of that company are not transferable, or because defendant is not an "assign" within the meaning of the ordinance, that is the affair of the street railway company, or of the city, or, possibly, of the state, and not of the plaintiff. For these reasons the second main question in the case must be answered in the negative also.

Order affirmed.

MITCHELL, J., *(dissenting.)*  It seems to me that the maintenance and operation of defendant's railroad constitutes a servitude additional to, and different from, the use for which the streets were acquired,—in short, a new use of the streets, not contemplated at the time of their dedication. I do not see that this road differs materially from any ordinary "commercial" railroad, except that it uses the entire length of the street as its depot at which it receives and lets off passengers. As operated, it is, to a certain extent, in aid of travel on the street; but this is a secondary and incidental, and not its main and principal, purpose. The doctrine of the opinion will, it seems to me, lead to the insidious encroachment of any and all railroads

upon the public streets, by their simply adopting certain slight and merely colorable changes in their mode of operation. I therefore dissent.