MARY E. HOWE & another vs. WEST END STREET
RAILWAY COMPANY.

HARRIET B. HOWE vs. SAME.

MIRIAM B. HOMER & another vs. SAME.

EDWIN H. ABBOT vs. SAME.

Middlesex.   December 4, 5, 1895. — October 23, 1896.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Street Railway — Maintenance of Electric Railway — Taking of Land or Ease-*
*ment — Compensation to Abutter — Equity — Constitutional Law.*

The maintenance of an electric railway, operated by an overhead single trolley
system in a public way, the location and operation of which are authorized by
the State and municipal authorities, does not constitute a new taking of land or
of an easement in land, for which compensation must be made to an abutter; and
the action of the electric current as shown by the evidence is not of such a nature
as to warrant enjoining the operation of the railway.

FOUR BILLS IN EQUITY, each filed April 5, 1894, by the
owners of land abutting on Garden Street in Cambridge, to
restrain the construction and operation of an overhead single
trolley system of electric cars upon that street.   The cases were
heard together before *Barker*, J., who entered a decree in each
case, denying the injunction prayed for, and dismissing the bill;
and the plaintiffs appealed to the full court.   The facts appear
in the opinion.

*S. Lincoln & W. S. Hall*, for the plaintiffs.

*H. D. Hyde & J. Fox*, for the defendant.

FIELD, C. J.   These are suits in equity heard by a single jus-
tice, and the evidence was taken before a commissioner.   The bill
in each case was dismissed, and the plaintiffs appealed.   The evi-
dence is voluminous, but the facts generally are such as are com-
monly known wherever electric street railways are used.   There
is some evidence concerning the electrolytic action of the electric
current on water and gas pipes in or near the street where the
railway is located, and conflicting evidence concerning the danger-
ous character of the electric current used by the defendant.   We
have no doubt that the current used is dangerous to animals and

to human beings when received under circumstances favorable for its transmission through the whole or a great part of the body.   In at least one of the suits, the plaintiffs own the fee of the land to the centre of the street, and a part of the tracks of the defendant have been laid on the street over the land of the plaintiffs.   It appears to us from the evidence that the facts substantially are as follows.   The electric railway of the defendant as now constructed and used is something intermediate between the street horse railway and the ordinary steam railroad.   The tracks often are as heavy, or nearly as heavy, as those of steam railroads, but of somewhat different shape.   They rest on sleepers or cross-ties embedded in the earth.   The exposed surface of the rails above the street does not differ much from that of horse car rails, and offers about the same obstruction to other forms of travel.   The electric cars usually are longer and heavier than horse cars, and they may be propelled at a much higher rate of speed.   They make more noise in the street, and usually stop to receive and deliver passengers only at designated points on the street.   They are as easily controlled as horse cars, but are perhaps appreciably more dangerous to other vehicles and to persons using the street than horse cars, because the momentum is greater, and, while horses of themselves often avoid danger, electricity knows no fear, and the only safety is from the care shown by the motorman or the conductor.   Since the introduction of electricity as a motive power, the lines of electric railways in thickly settled communities have been extended, so that there are connecting lines many miles long.   Such lines may be used more or less for the transportation of merchandise as well as passengers.   In the present cases the defendant uses the overhead single trolley system.   Cylindrical iron poles have been set opposite to each other in the sidewalks of the streets, at intervals of about one hundred and twenty feet.   These poles are set in the ground about six and one half feet, and rise above the ground about twenty-three and one half feet.   Between the tops of the poles are stretched across the street two sets of wires, one above the other.   The lower wires sustain the trolley wire, the upper wires support two guard wires above the trolley wire; and these cross wires and guard wires are strengthened by stay wires and anchor wires extending from the wires to the poles.

There are also feed wires attached to the poles. There are return wires buried in the street, and the rails are connected with each other by wires, and are also connected with the return wires, all under the surface of the street. The electricity is generated by dynamos at the power-house and may be sent out over the trolley wire and its feeders, when it passes down through the trolley arm into the machinery of the car, back through the rails, return wires and the earth, or through other conductors to the power-house, or the current may be reversed and sent out through the rails and wires in the earth up through the machinery of the car and the trolley arm to the trolley wire, and then back to the power-house.

The construction and use of an electric railway in a public street sometimes enhance and sometimes diminish the value of the adjoining real property. Suburban lands usually are made more valuable by the construction of such a railway, because the lands can be conveniently reached thereby from the thickly settled portions of a city, but many householders prefer to have the tracks not in the street immediately in front of their dwellings, but in some neighboring street, on account of the noise, and the running of electric cars in front of costly dwelling-houses in a narrow street often is a serious detriment to the property on the street. The defendant's acts in the location and operation of the street railway complained of appear to have been duly authorized by the board of aldermen of the city of Cambridge.

The principal contention of the plaintiffs is that the maintenance of an electric railway operated by the single trolley system in a public way imposes an additional servitude upon the land, and is a taking of the property of an abutter within the meaning of the Constitution, whether he owns the fee of the way, or to the centre line of it, or owns only to the side line of the way, because it is constructed in such manner as to cause a permanent obstruction to other uses of the way, subjects the property of the abutter to the dangers of a permanent current of electricity which may injure property and persons, and involves the use of heavy vehicles in the street, running long distances without stops at a high rate of speed, which use injures property by the constant jar from the cars and by the noise. The statutes of the Commonwealth make no provision for com-

pensation to abutters when an electric railway is laid in a public way, and if the location and maintenance of such a railway in a public way are a taking of private property within the meaning of the Constitution, such location and maintenance are illegal, and the statutes are unconstitutional.

It is obvious that the use made of a public way in the operation of an electric railway is of the same general kind as that for which the way was originally laid out, viz. the transportation of persons and things from place to place along the way. It is equally obvious that the actual operation of the electric railway shown in the present cases does not exclude ordinary travel from the way; that there is no exclusive occupation by the railway of any part of the surface of the way, and that the overhead structure is incidental to the use of the surface of the way, and does not prevent the public from using the way in the ordinary manner. The use of the ordinary steam railroad when it crosses a public way or runs along the way is intended to be in a sense exclusive. Provision is made by statute for the erection of gates at some of the crossings of public ways by railroads, or for signals which shall indicate the approach of trains, and the express or implied intention is that the railroad trains shall not give way to travellers on the way, but that travellers shall give way to them, and the gates or signals are intended to warn such travellers against being on the track at the time of the passage of trains. The whole system of street railways is founded on the theory that the use of the ways by the railways must be consistent with the use of the ways by other travellers at the same time. The regulation of street railways which boards of aldermen and selectmen are empowered to make has this end in view. Pub. Sts. c. 113, § 27. The statutes and the decisions of the courts give the street railway companies certain rights to the use of their own tracks in the public ways not possessed by travellers generally, but still the right of other travellers to use the ways in a reasonable manner is recognized and enforced against the railway companies. The theory on which it has been held that the taking of a part of a public way for a railroad location was a new use, for which compensation must be made, was that by this taking and the subsequent use the public were at times excluded from

the way and the abutting landowner was excluded from his land included within the limits of the way. *Springfield* v. *Connecticut River Railroad*, 4 Cush. 63, 71. Railroad companies are required to fence their locations except at crossings; they cut the grass and bushes on the locations to prevent the spread of fires; and the landowner has no right of crossing the location at other than public crossings, except it has been given him in a certain manner. When railroads have been located on the surface of the streets of cities for the purpose of transporting merchandise or passengers from place to place, under such regulations as permit the streets to be used for travel and transportation in the ordinary manner and other than horse power to be used, the location has not generally been regarded as a new taking, and the abutters generally have not been held entitled to damages. *Montgomery* v. *Santa Ana Westminster Railway*, 104 Cal. 186. *Barney* v. *Keokuk*, 94 U. S. 324. *Nichols* v. *Ann Arbor & Ypsilanti Street Railway*, 87 Mich. 361. *Newell* v. *Minneapolis, Lyndale, & Minnetonka Railway*, 35 Minn. 112. *Briggs* v. *Lewiston & Auburn Horse Railroad*, 79 Maine, 363. *Williams* v. *City Electric Street Railway*, 41 Fed. Rep. 556. *Stanley* v. *Davenport*, 54 Iowa, 463. See, *contra*, *Street Railway* v. *Doyle*, 88 Tenn. 747. In the few instances in which such a use of the streets of a city has been authorized in this Commonwealth, the statutes have made no provisions for damages. Sts. 1866, c. 267; 1867, c. 170; 1868, c. 97; 1872, c. 342.

The test whether the land under a street is subjected to a new use by the operation of new forms of transportation of persons or things is undoubtedly in some respects a question of degree, but the solution of it does not depend so much upon the kind of power used as upon the structures which are required and the change in the occupation and use of the street occasioned by the new form of transportation. Elevated railroads upon permanent elevated iron or steel structures have been held elsewhere to be a new use, which entitles the landowners to compensation in damages. Horse railways on the surface of the street, which do not prevent the use of the streets by ordinary travellers, have been held in this Commonwealth not to constitute a new use which requires compensation. *Attorney General* v. *Metropolitan Railroad*, 125 Mass. 515. Electric rail-

ways such as are shown in the present cases are undoubtedly an approach in construction and in the manner of operation to the steam railroad, but so long as the companies are authorized to use the streets only in common with other travellers, and their structures do not prevent other travellers from using them in the ordinary way, and do not furnish any greater obstruction to light and air than appears in the present cases, this use does not seem to us to constitute a new taking of land, or of easements in land, for which compensation must be made. *Pierce* v. *Drew*, 136 Mass. 75. *Rafferty* v. *Central Traction Co.* 147 Penn. St. 579. *Taggart* v. *Newport Street Railway*, 16 R. I. 668. *Green* v. *City & Suburban Railway*, 78 Md. 294. *Louisville Bagging Manuf. Co.* v. *Central Passenger Railway*, 95 Ky. 50. *Halsey* v. *Rapid Transit Street Railway*, 2 Dick. 380. *West Jersey Railroad* v. *Camden, Gloucester, & Woodbury Railway*, 7 Dick. 31. *Cumberland Telegraph & Telephone Co.* v. *United Electric Railway*, 93 Tenn. 492. *San Antonio Rapid Transit Street Railway* v. *Limburger*, 88 Tex. 79. The danger to persons or property from the electric current is not of so grave a character as to require the exclusion of the public from the streets occupied by the railway, and the limits and extent of the liability of the railway company for injuries to persons or property through the action of the electric current need not be considered in determining the present cases. Such action of the electric current does not amount to a taking of land, or of an easement in land, and is not, as shown by the evidence, injurious to property to such an extent as to warrant enjoining the operation in the public streets of a railway which has been authorized by the Legislature.

*Bills dismissed.*