## THE DETROIT CITY RAILWAY v. MERRILL B. MILLS AND JOHN BREITMEYER.

[See 77 Mich. 210.]

*Constitutional law — Street railways — Operation by electricity — Rights of adjoining lot-owner—Equity practice.*

1. Complainant, a street railway company organized under Act No. 148, Laws of 1855, as amended (chapter 94, How. Stat.), filed a bill to restrain the defendants from interfering with the construction of its railway in a certain street, to be operated by electricity, by cutting down the poles erected for that purpose. The defendants answered, admitting the interference charged in the bill, and claiming a legal right thus to prevent the construction of an electric street railway on the street, and alleging that street-railway cars, propelled by electricity, could not lawfully be used on the street in the manner intended by complainant, and denying the power of the common council to permit the erection and maintenance of such electrical apparatus without the consent of abutting property-owners, or without condemnation proceedings, and claiming that the construction and use of such a railway would limit, impair, and impede the use and enjoyment of defendants' property, and impose an additional servitude upon the street. Defendants also filed a cross-bill praying for a perpetual injunction against the use of such

railway in said street. A hearing was had upon pleadings, and proofs taken in open court, and a decree made in favor of complainant; and, on the hearing of defendants' appeal therefrom, Mr. Justice GRANT filed an opinion, concurred in by LONG, J., favoring an affirmance of the decree for reasons stated in the opinion, which *result* was concurred in by CHAMPLIN, C. J., for the reasons:

*a*—That the complainant was proceeding under color of legal authority to construct its railroad.

*b*—That the defendants have a complete legal remedy for all injuries complained of in their cross-bill.

2. The following propositions are summarized from the opinion of Mr. Justice GRANT:

*a*—In construing the constitutionality of a statute, as well as in interpreting a provision of the Constitution itself, the practical construction which the people have placed upon it during a series of years will be adopted by the courts, unless there is a clear infraction of some constitutional provision; citing Cooley, Const. Lim. (6th ed.) 81; *People v. Hammond*, 13 Mich. 256; *People v. Goodwin*, 22 Id. 500; *Westinghausen v. People*, 44 Id. 265; *Frey v. Michie*, 68 Id. 323.

*b*—Act No. 148, Laws of 1855, as amended (How. Stat. chap. 94), is not unconstitutional because the original act only provided for the carriage of *freight*, while as amended it provides for the transportation also of *passengers*.

*c*—The claim that the municipality of the city of Detroit does not possess the power to permit the complainant to operate its cars by electricity, and that, therefore, complainant is acting without authority of law, if conceded, is a matter between the complainant and the State, and the defendants are not in a position to raise the question. *Potter v. Street Railway*, 83 Mich. 285.

*d*—The Legislature has expressly conferred upon the cities of this State the right to authorize the use of any motive power whatever upon their street railways, which includes the right to authorize the use of electricity.

*e*—The use of a city street for street railways does not impose such a new burden and servitude, additional to what was implied by the dedication, that it is beyond the power of the city to authorize their construction without additional compensation to abutting lot-owners.

*f*—The complainant cannot lawfully construct and operate its road in a street too narrow to admit of the passage of cars and other vehicles at the same time, nor so construct it as to interfere with the rights of the general public in the street (*Railway Co. v. Railway Co.*, 48 Mich. 433); nor in a street,

though of sufficient width, if its condition be such that the operation of the railway will result in the practical exclusion of others from the use of the street. A railway so constructed and operated would be a public nuisance, and the courts would abate it.

*g*—Complainant's road-bed and track must be built substantially with the level of the street, so as to permit vehicles to cross without difficulty, and the poles must be so placed as not to interfere with the right of ingress to and egress from abutting property.

*h*—It is within the discretion of the circuit judge on the hearing of an equity case in open court to limit the number of witnesses to any particular fact, but beyond the exercise of this discretion only such testimony can be excluded as is scandalous and impertinent.[1]

3. Mr. Justice McGRATH filed a dissenting opinion, concurred in by MORSE, J., from which the following propositions are summarized:

*a*—This case hinges upon the question whether or not the construction and operation of a street railway in a street, and, as incident thereto, the placing of poles therein upon which are to be stretched electric wires, is a new servitude; and I am clearly of opinion that a street railway, whether operated by animal power, electricity, or steam, is an additional burden; and it seems to me that the exemption of any street, whether narrow or not, is a practical concession to this view.

*b*—It may be conceded that street-car service is a public convenience, but the necessity of the public must be supplied at public expense. The Legislature has no right to say that the property of the individual may be taken or injuriously affected for the public good without compensation. Public convenience is not to be subserved at the expense or disadvantage of the private citizen.

*c*—This is not a question of whether or not the public shall have street railways or rapid transit, but whether the owners of property shall be divested of its beneficial use and enjoyment without compensation, because a private corporation is attracted by the prospective revenue to be derived from the enterprise, and, upon the plea that it will be a great public convenience, has obtained a franchise to appropriate a portion of the street to its use. It is upon this same plea that the public, through its legislatures, has parted with about all it had that was of value, except its interests in the public high-

[1] See *Barhyte v. Summers*, 68 Mich. 341; *Riggs v. Sterling*, 60 Id. 644; *Meech v. Lee*, 82 Id. 275.

ways, and it remains to be seen whether they, too, will be surrendered to monopolistic control, to the detriment, not only of the public, but of abutting land-owners, who have special interests in these ways which courts, at least, are bound to respect.

d—In this commercial age there is a growing tendency to avoid those constitutional methods which are designed for the protection of property rights of individuals which should be checked, else courts will in time be powerless to protect the rights thus acquired from unlawful attack or abuse.

e—The Constitution provides that private property shall not be taken until the necessity therefor shall have been first determined by a jury, and not then until compensation shall be made therefor. If the necessity for this use of our public streets is so pressing, there should be no difficulty in its determination by the method pointed out by the Constitution, rather than by the desire on the part of the corporation to use the street for the purposes of revenue; and whether the injury to abutting property is slight or great is a matter of fact to be determined by a jury, upon proper consideration of the situation and circumstances of each case.

4. The following propositions are summarized from the dissenting opinion of Mr. Justice MORSE:

a—I am satisfied that the system of railway in operation upon Mack street does fasten a new burden upon the land of the abutting owners on that street. It introduces a new and dangerous element of locomotion, certainly not known, or even thought of, when the street was dedicated to public use, and for the purpose of public travel.

b—I know that the current of authority, what little there is of adjudication upon the subject, is to the contrary; but in every single case the reasoning of the opinion, to me, rests upon a false and dangerous foundation. It is that the rights of the individual must give way to the needs of the public, in the use of new discoveries and inventions to facilitate travel and rapid transit in the great and growing cities of our land. But there is no public need that can, in right, be permitted to destroy or damage the property of the individual without compensation. The safety of this government, and of every community, rests upon the protection of the law to rights of the individual man.

c—Railroads and other corporations ought not to be permitted, under any plea of the public convenience or welfare, practically to destroy the dwelling-place of the humblest citizen, or to damage it, without compensation; and when such an attempt is made, without any proposed compensation, and

without the consent of the owner of the property, the strong arm of equity ought to interpose to save the rights of the individual thus threatened, without reference to the effect of such action upon the public, or its convenience.

*d*—It is bad enough, under the exercise of the power of eminent domain, to destroy or damage the home of the citizen, which he has planted upon the spot where he desired it to stand, when he is compensated for the pecuniary sacrifice, but it is a crime against him, and a violation not only of our Constitution, but of the very essence of liberty, to damage or destroy it without compensation, at the will of municipal or other corporations.

*e*—In my opinion, neither the city nor the Legislature can permit a private or public corporation practically to destroy an existing street without the intervention of a jury or of commissioners to assess the consequent damages to the abutting owners.

*f*—The public need and are benefited by steam railroads, and the progress of civilization would be checked and the world at a standstill without them; but they have never been allowed to acquire private property except by purchase or condemnation. But here is an electric railway company permitted to take private property without consent or condemnation, and the land-owner is powerless to prevent it; and it is doubtful, from the opinions of some of the learned judges who have upheld such proceedings, if he can even seek relief, after the road is in operation, in a court of law, for the actual damages he has suffered. In my opinion, no legislative grant, or municipal authority under such a grant, can thus deprive an individual of his interest in land, no matter how urgent the wants of the public. The need of the public cuts no figure when the question of compensation to the land-owner for the taking of his property is mooted. It can only be considered when the question of the right to take it at all is raised.

Error to Wayne. (Reilly, J.) Argued November 13, 1890, and reargued February 25, 1891. Decided May 8, 1891.

Bill to restrain defendants from interfering with the construction of an electric street railway. Defendants appeal. Decree affirmed. The facts are stated in the opinion.

*Brennan & Donnelly, S. T. Miller, Hoyt Post,* and
*W. H. Wells,* for complainant, contended:

1. Many cases have been before this Court in which various provisions of the act under which complainant is incorporated, as applicable to street railways, have been involved, and in no case has it ever been suggested or hinted at that the act was unconstitutional; citing *LeRoy v. Railway,* 18 Mich. 233; *Railway Co. v. Railway Co.,* 48 Id. 433; *Railway Co. v. Guthard,* 51 Id. 180; *City of Detroit v. Railway Co.,* 76 Id. 421.

2. The objection that complainant does not possess the corporate power to apply anything but animal power in conducting its business is a question that only concerns the State, the complainant and its stockholders, and the city of Detroit; citing *Jones v. Habersham,* 107 U. S. 174; *Newell v. Railway Co.,* 35 Minn. 112; *DeCamp v. Dobbins,* 29 N. J. Eq. 36; *Bridge Co. v. Prange,* 35 Mich. 400; *Swartwout v. Railroad Co.,* 24 Id. 393; *Railway Co. v. Orton,* 32 Fed. Rep. 471.

3. Under the provisions of chapter 94, How. Stat., complainant has the lawful right to employ electricity in the propulsion of its cars; and, by the terms and provisions of the ordinance adopted by the municipality, it is authorized to use such system of electric motive power as it shall deem best for the propulsion of its cars on any of its existing lines, or on lines to be thereafter constructed and put in operation.

4. There is no specific provision in chapter 94 authorizing the amendment of articles of association of companies, except as relates to the increase of the capital stock and of the membership of the board of directors. And where the Legislature in express terms provides that certain increased powers shall be exercised by existing corporations, and does not provide for a specific form of acceptance thereof by the corporation, by the amendment of its articles of association or in some other formal manner, it must necessarily be presumed that it was the intention of the Legislature that the amendments would become operative by force of their enactment, and would thereby become embodied in the charter of existing corporations, and when the corporation proceeds to exercise the powers so conferred it will be conclusively presumed to have consented to the amendment; citing *People v. Plank-road Co.,* 10 Mich. 400; *Joy v. Plank-road Co.,* 11 Id. 155.

5. The main question involved in this case is whether the use of Mack street for complainant's road is such a one as imposes a new burden and additional servitude to what was implied by the dedication of the street, so that it is beyond the power of

the city, without additional compensation to defendants, to authorize complainant to make the contemplated use of the public highway.

The owner of a lot abutting upon a public highway may sustain a threefold relation to the highway:

*a*—As owner of the reversionary interest of the soil of the street to the center thereof.

*b*—As owner of the lot and the rights appurtenant to the lot, of ingress and egress and access to the lot from the street.

*c*—As one of the general public.

It seems apparent that the distinction between the first two of these relations is not always kept clearly in mind by the courts in dealing with this question, which distinction is clearly pointed out in *Railroad Co. v. Heisel*, 38 Mich. 62. Some of the decisions, in discussing these questions, make a point upon what matters are lawfully taken into account in condemning lands for a highway. The measure of damages for land actually taken is never less than its full market value. The perpetual easement is worth such market value, and generally costs all of that. Who ever heard of any one contending that any deduction should be made from such market value for the value of the reversionary interest? citing *City of Detroit v. Chaffee*, 68 Mich. 635, as an instructive case in this regard.

6. The tendency of modern decisions is rather to extend the public easement than to restrict it; and this is a necessity, from the increased public requirements in large and growing cities; citing Ang. Highw. § 312; *Town of Palatine v. Kreuger*, 121 Ill. 74; and it has been held that a common highway may, by consent of the state, be converted into a turnpike or plank road, upon which tolls are collected; citing *Com. v. Wilkinson*, 16 Pick. 175; *Benedict v. Goit*, 3 Barb. 459; *Wright v. Carter*, 27 N. J. Law, 76; *Plank-road Co. v. Cane*, 2 Ohio St. 419; *Douglass v. Turnpike Co.*, 22 Md. 219; and in *Murray v. Commissioners*, 12 Metc. 455, it is held that the change of a turnpike into a common highway did not entitle abutting owners to a new compensation.

7. The question whether the use of a street for an ordinary railroad, operated by steam, imposes a new burden, has been decided both ways, but the Heisel case has settled the question for this State in the affirmative, and that decision is undoubtedly in accord with the weight of authority in this country; and it is equally true that the great weight of authority is that the use of a public street for a street railway does not impose any new burden,—indeed the decisions are almost unanimous on this point. In *Wager v. Railroad Co.*, 25 N. Y. 526, the question was as to the right to maintain an ordinary railroad

track over which the cars were to be propelled by horse-power, and the decision was adverse; and the case of *Craig v. Railroad Co.*, 39 Barb. 494, flatly decides that a street railway operated by horse-power is a new burden beyond the easement. This, however, is the only case that goes this .far, and the later cases of *People v. Kerr*, 27 N. Y. 183, *Kellinger v. Railroad Co.*, 50 Id. 206, and *Mahady v. Railroad Co.*, 91 Id. 148, completely overrule that decision, and hold in full accord with the general doctrine, which is also supported ʻby the following cases: *Elliott v. Railroad Co.*, 32 Conn. 579; *Hinchman v. Railroad Co.*, 17 N. J. Eq. 75; *Attorney General v. Railroad Co.*, 125 Mass. 515; *Eichels v. Railway Co.*, 78 Ind. 261; *Hobart v. Railroad Co.*, 27 Wis. 194; *Brown v. Duplessis*, 14 La. Ann. 843; *Railway Co. v. Railway Co.*, 31 Kan. 660; *Smith v. Railroad Co.*, 87 Tenn. 626; *Coach· Co. v. Railroad Co.*, 33 N. J. Eq. 267; *Briggs v. Railroad Co.*, 79 Me. 363.

8. This Court, having distinctly held that steam is an admissible motive power in the common highway, if it shall follow the almost unanimous course of decisions of the American courts,— that the track and cars of the ordinary street railway do not impose any new servitude upon the public highway,—is bound to hold that a local street railway of ordinary construction is admissible though steam motive power be adopted. In the light of the authorities cited, we are prepared to discuss the specific question involved in this cause,—whether an ordinary street railway, operated by electricity, with overhead wires suspended from poles, is an admissible use of the public highway. While the use of electricity as a street-car motive power is of very recent origin, the question of the right to use it has already been before the courts in several cases, some of which we cite below, and we believe we hazard nothing in saying there has never yet been any adverse decision in any court; citing *Taggart v. Railway Co.* (R. I.)‚ 19 Atl. Rep. 326; *Pelton v. Railroad Co.*, 22 Wkly. Law Bul. 67; *Henderson v. Railway Co.*, 21 Fed. Rep. 358; *Teachout v. Railway Co.*, 75 Iowa, 722; *McCormick v. District of Columbia*, 54 Am. Rep. 284; *Roake v. Telephone Co.*, 41 N. J. Eq. 35.

*William Look* and *H. F. Chipman* (*Don M. Dickinson,* of counsel), for defendants, contended:

1. The proposed use of the street by complainant is not within the intent or the letter of the laws of ʻMichigan applicable to the subject, and the operation of complainant's cars imposes a new burden and additional servitude upon the street.

&5 Mich–41.

2. There are many cases which hold that the construction and operation of a street railway, where the motive power is animal, is a proper use of the street; but there is no case in which such a decision is made where the power used or appliances employed are of a destructive nature, and of such a character that they do in fact or are likely to injure the property of adjoining owners; citing *Com. v. Temple*, 14 Gray, 69; *Railroad Co. v. Railroad Co.*, 12 Allen, 262; *Attorney General v. Railroad Co.*, 125 Mass. 515; *Elliott v. Railroad Co.*, 32 Conn. 579; *Railway Co. v. Cumminsville*, 14 Ohio St. 523; *Hobart v. Railroad Co.*, 27 Wis. 194; *Railway Co. v. Railway Co.*, 51 Cal. 583; *Hinchman v. Railroad Co.*, 17 N. J. Eq. 75; *Railroad Co. v. Railroad Co.*, 20 Id. 61; *State v. Laverack*, 34 N. J. Law, 201, 205; *Hiss v. Railway Co.*, 52 Md. 242; *Eichels v. Railway Co.*, 78 Ind. 261; *Hodges v. Railway Co.*, 58 Md. 603; *Randall v. Railroad Co.*, 19 Fla. 409; *Sears v. Railway Co.*, 65 Iowa, 742; *Railway Co. v. Railway Co.*, 64 Texas, 80; *Newell v. Railway Co.*, 35 Minn. 112; *Teachout v. Railway Co.*, 75 Iowa, 722; *Briggs v. Railroad Co.*, 79 Me. 363; *Railroad Co. v. Nestor*, 10·Colo. 403 (15 Pac. Rep. 714); *Mahady v. Railroad Co.*, 91 N. Y. 148.

3. It is the property right of the lot-owner that no method of the use of the street shall be adopted which endangers the use and enjoyment of his property within the boundaries of his lot; citing *Story v. Railroad Co.*, 90 N. Y. 145, 146; *Lahr v. Railway Co.*, 104 Id. 268, 287–295; *Railroad Co. v. Nestor*, 10 Colo. 403; *Railway Co. v. Cumminsville*, 14 Ohio St. 523, 544–549; *Crawford v. Village of Delaware*, 7 Id. 459, 469, 470; *Stanley v. City of Davenport*, 54 Iowa, 463, 475; *Hinchman v. Railroad Co.*, 17 N. J. Eq. 75, 79, 80; *Adams v. Railroad Co.*, 39 Minn. 286; *Railroad Co. v. Reinhackle*, 15 Neb. 279; *Mollandin v. Railway Co.*, 14 Fed. Rep. 394; *Hobart v. Railroad Co.*, 27 Wis. 194, 200; *Railroad Co. v. Heisel*, 47 Mich. 393.

4. Defendants' rights in the street are property rights, which cannot be taken away from them without compensation. The public have only an easement and right of passage over the street, and the title in the public is a trust for the enjoyment of said easement. The fee remains in the grantor and his grantees, and equity will enforce such a trust; citing *City of Detroit v. Railway Co.*, 76 Mich. 421; *People v. Beaubien*, 2 Doug. 256, 270; *Railroad Co. v. Hartley*, 67 Ill. 439, 444; *City of Jacksonville v. Railway Co.*, Id. 540; *Princeville v. Auten*, 77 Id. 325; *Warren v. Mayor*, 22 Iowa, 351; *Reidinger v. Railroad Co.*, 62 Mich. 29, 45; *Story v. Railroad Co.*, 90 N. Y. 122,

157; *Lahr v. Railway Co.*, 104 Id. 268, 291, 292; *Adams v. Railroad Co.*, 39 Minn. 286; *Wyman v. Mayor*, 11 Wend. 487, 497–503; *Railroad Co. v. Nestor*, 10 Colo. 403; *Railway Co. v. Cumminsville*, 14 Ohio St. 549.

5. Upon the facts in this case, and upon the merits, if an injunction is to issue at all, it should be granted to the defendants, on the ground that there has been a complete failure to compensate them, or to tender compensation to them, for damages incurred by locating complainant's track, poles, and wires, and charging the same with electricity, and running its cars thereby over and in front of the lands and premises of defendants, and thereby imposing a new burden and additional servitude upon the street; citing *Richards v. Railroad Co.*, 18 Iowa, 259; *Sidener v. Turnpike Co.*, 23 Ind. 623; *Commissioners v. Durham*, 43 Ill. 86; *Powers v. Bears*, 12 Wis. 213; *Railroad Co. v. Railroad Co.*, 25 N. J. Law, 384; *Folley v. City of Passaic*, 26 Id. 216; *Murdock v. Railroad Co.*, 73 N. Y. 579; *Railroad Co. v. Owings*, 15 Md. 199; *Carpenter v. Grisham*, 59 Mo. 247; *Bohlman v. Railway Co.*, 30 Wis. 105, 40 Id. 157; *Cobb v. Railroad Co.*, 68 Ill. 233; *Penrice v. Wallis*, 37 Miss. 172; *Coal Co. v. Coal Co.*, 37 Md. 537; *Bensley v. Water Co.*, 13 Cal. 306.

6. The dedication of the street by the owner to the highway is not a dedication to the use of the railway company, the two being essentially different. The railway company cannot, therefore, build on the highway without compensation to the owner, and, the injury sustained by an attempt so to do being in the nature of a continuing trespass, an injunction is the appropriate remedy; citing *Williams v. Railroad Co.*, 16 N. Y. 97; *Langabier v. Railroad Co.*, 64 Ill. 243; *Harrington v. Railroad Co.*, 17 Minn. 215.

GRANT, J. The complainant was organized in May, 1863, under chapter 94, How. Stat. It has from time to time extended its tracks, under the direction of the common council, upon the streets of the city, until it now has many miles of road and large amounts of money invested. It has, during the 27 years of its existence, been engaged in the business of carrying passengers to and from different parts of the city.

January 3, 1889, the common council authorized the complainant to lay, construct, use, and operate a single street-railway track in, along, and through Mack street,

from its conjunction with Gratiot avenue to the city limits. It fixed the rate of speed at not less than six nor more than ten miles per hour. It also provided that, whenever the complainant should deem it advisable, it might substitute in lieu of animal power such system of electric or other motive power, except steam, as should seem best in its judgment for the purpose of properly and safely conducting its said business in said city of Detroit, upon any or all of its said lines now in use and operated, or hereafter to be used and operated, by said company, and that such change should be made under the supervision of the board of public works. This ordinance was duly accepted by the complainant. Complainant proceeded to construct its track upon Mack street, and concluded to use the system of electric motive power instead of horse-power. This system is the same as the one involved in the case of *Potter v. Saginaw Union Street Railway,* 83 Mich. 285. The system and the construction of the road are there sufficiently described. Complainant was proceeding to erect its poles upon the side of the street fronting the premises of the defendants, the poles being placed 125 feet apart. The defendants interferred with the construction by cutting down the poles, and threatened to continue to do so. The complainant thereupon filed its bill of complaint to restrain this interference on the part of the defendants.

The defendants answered, admitting their action, and claiming their legal right thus to prevent the construction of an electric street railway on the street. They allege that street-railway cars, propelled by electricity, cannot lawfully be used on the street in the manner intended by complainant. They deny the power of the common council to permit the erection and maintenance of this electrical apparatus without the consent of abutting property-owners, or without condemnation proceed-

ings, and claim that the construction and use of this railway limits, impairs, and impedes the use and enjoyment of their property, and imposes an additional servitude upon the street. They also filed a cross-bill praying for a perpetual injunction against the use of such railway.

The case was heard upon pleadings and proofs, and decree entered in favor of the complainant, the railway company.

1. The act under which complainant is organized is attacked as unconstitutional and void in that it embraces more than one object, which is not expressed in its title. The original act was passed in 1855, under the title of "An act to provide for the construction of train railways."[1] Its purpose is stated in section 1 as follows:

"Any number of persons, not less than three, may be formed into a corporation for the purpose of constructing and owning a train railway or road, to be operated by horse or other animal power, by complying with the following requirements."

The first twelve sections provided for the details of the organization, and for the obtaining of lands, by purchase or condemnation, for its road-way, gates, toll-houses, etc. The next two sections provided for the use of the road by any person, by paying certain tolls for every coal car, ore-car, or other vehicle drawn over it. It is unnecessary to mention the provisions of the other sections of the original act. Nothing is said in the act about the carriage of passengers.

This act was amended in 1861 by adding two new sections, providing for the organization of companies under the act to construct and operate railways in and through the streets of any town or city, upon obtaining consent of the municipal authorities, and under such regulations

---

[1] Act No. 148, Laws of 1855.

as they might from time to time prescribe. In 1867 three additional sections were added, and in 1871 two, providing additional regulations for the construction and operating of street railways in cities and along the public highways. The amendment of 1867 also provided for the operation of the cars by steam, or any power other than animal power, under the authority of the municipality. The alleged dual object consists in this, viz., that the original act provided for toll-roads for the carriage of freight, while the amendment provided for railways for the transportation of passengers.

Street railways have existed under this act for nearly 30 years. Millions of money have been invested in them. They have been extensively used by the people. This complainant has, during its existence, been engaged exclusively in the carriage of passengers. It has become not only a convenience, but a necessity, to the people. In the many cases brought to this Court involving the various provisions of the act, its constitutionality was never raised, and is now for the first time doubted. If its constitutionality were doubtful, courts might well be justified in upholding the practical construction which has thus been adopted by the people. The people have acted and invested upon the faith of its validity for the last 27 years, not only in the city of Detroit, but in many other cities of the State, and the State authorities have never questioned it.

In construing the constitutionality of a statute, as well as in interpreting a provision of the Constitution itself, the practical construction which the people have placed upon it during a series of years will be adopted by the courts, unless there is a clear infraction of some constitutional provision. In such cases the argument *ab inconvenienti* will be allowed to have great weight. Cooley, Const. Lim. (6th ed.) 81; *Stuart v. Laird*, 1 Cranch, 299;

*Martin v. Hunter's Lessee,* 1 Wheat. 304, 351; *Cohens v. Virginia,* 6 Id. 264; *Bank v. Halstead,* 10 Id. 51; *Westinghausen v. People,* 44 Mich. 265; *People v. Hammond,* 13 Id. 256; *Frey v. Michie,* 68 Id. 323; *People v. Goodwin,* 22 Id. 500.

But upon its merits we see no force in the position. The general purpose of the act is to provide for local railway transportation. Its title is "An act to provide for the construction of train railways." Whatever may be included under the title of an act when passed may also be included by subsequent amendment. The general railroad law is silent in its title as to what may be transported under it, yet no one ever thought to question its validity upon the ground that it provided for the carrying of both freight and passengers. If the provisions of the amendment are germane to the object expressed in the title, this is all that the Constitution requires. In determining this question the law must be considered as a whole, as amended. The amendment is incorporated into the original act, and becomes a part of it. The same rule of construction will be applied to the amended act as to the original act. The word "train," as used in this law, is defined to be a "continuous or connected line of cars or carriages on a railroad." Certainly the carriage of passengers is as germane to the object expressed in the title as is the carriage of freight. Either could be incorporated into the law by amendment without violating the constitutional provision. Counsel for the defendants are in error in interpreting the original act to be limited to the carrying of "ore, mineral, copper, and iron." The corporations therein provided for had the right to carry any and all kinds of freight.

2. It is next insisted that the municipality of the city of Detroit does not possess the power to permit the complainant to operate its cars by electricity, and that, there-

fore, the complainant is acting without authority of law. The precise claim is that chapter 94, How. Stat., does not authorize the use of this motive power by the companies to be organized under it, but limits them to the use of such powers as were known at the time of the passage of the act and the amendments thereto. Granting this position to be correct, it follows that the action of the complainant is *ultra vires* of the corporation. The obvious and conclusive answer to this claim is that it is a matter between the complainant and the State. The defendants are not in position to raise the question. The mere usurpation of corporate authority does not confer upon the individual the right to bring suit to restrain the unlawful exercise of authority, nor to raise it collaterally. If the State chooses to waive it, or by its silence permit the action, no others can complain, so long as the personal or property rights of the individual are not invaded or affected. It therefore follows that, unless these defendants are injured, they are not concerned in this question. *Swartwout v. Railroad Co.*, 24 Mich. 393; *Jones v. Habersham*, 107 U. S. 174 (2 Sup. Ct. Rep. 336); *Newell v. Railway Co.*, 35 Minn. 112 (27 N. W. Rep. 839); *Railway Co. v. Orton*, 32 Fed. Rep. 471; *Bridge Co. v. Prange*, 35 Mich. 400. Until the right has been determined in a direct proceeding brought by the State or the city, the complainant may continue the use of such power.

3. It is unnecessary to discuss the proposition that the right of the complainant to use electricity is not conferred by the original act of 1855. By the act of 1867 the right to use any other than animal power was expressly conferred, to be exercised under the authority and direction of the municipal authorities. By the act of 1871, section 1 was amended so as to provide for constructing, owning, and operating a train railway or road for the conveyance

of persons or property, to be operated by horse or other animal power, or by steam, or by pneumatic or any other motive power, or by any combination of them. How. Stat. §§ 3495, 3533. Upon the authority thus conferred the common council of the city of Detroit passed the ordinance above mentioned. In accepting the ordinance, the complainant accepted the provisions of the law as an amendment to its corporate powers. This would be true if its articles of association described its purpose to be the construction of a horse railroad, as it is stated to be in defendants' brief. The language, however, of the articles is broader than this, for its purpose is declared to be the construction of a horse or city railroad, under the act of the Legislature above mentioned.

The general railroad law enacted in 1855 provides for the use of the force and power of steam, of animals, or any mechanical power, or any combination of them. If some new motor (such as a storage battery, which counsel for the defendants in their brief say will no doubt be discovered in the immediate future) should be found to take the place of steam, and thereby dispense with the noise incident thereto, and the discomforts of dirt and smoke, would it be contended that railroad companies could not use it, under the provisions of this law, because it was not known at the time the law was passed? These laws were enacted in times of rapid advancement in the mechanical arts. This advancement is nowhere more forcible shown than in the discovery and use of devices and motors to facilitate travel and transportation. It cannot, in my judgment, be held that the Legislature intended to limit these corporations to the use of things that were then known. This rule would be too rigid and technical to merit approval. The common law is more elastic and progressive. It adapts itself to meet the

needs of the people, and the advance of science and civilization.

As well might it be contended that when land is dedicated to or condemned for the public use for highways its use must be limited to the then known methods of travel and transportation. Engines now travel over nearly every public highway in the agricultural portion of the country, propelled by steam, drawing large machines, and stopping at nearly every farm to facilitate the work of the farmers; yet upon this innovation of the use of the highway this same principle was invoked as is now invoked to prevent it. *Macomber v. Nichols*, 34 Mich. 212. In this case the defendant was held liable in the circuit court for running such an engine along the highway. In his opinion, Chief Justice COOLEY says:

"Persons making use of horses, as the means of travel or traffic by the highways, have no rights therein superior to those who make use of the ways in other modes. It is true that locomotion upon the public roads has hitherto been chiefly by means of horses and similar animals, but persons using them have no prescriptive rights, and are entitled only to the same reasonable use of the ways which they must accord to all others. Improved methods of locomotion are perfectly admissible, if any shall be discovered, and they cannot be excluded from the existing public roads, provided their use is consistent with the present methods."

Steam has been used as a motor in the public streets, and its use sustained. *Moses v. Railroad Co.*, 21 Ill. 516. The court in that case say:

"A street is made for the passage of persons and property, and the law cannot define what exclusive means of transportation shall be used. * * * To say that a new mode of passage shall be banished from the streets, no matter how much the general good may require it, simply because the streets were not so used in the days of Blackstone would hardly comport with the advancement and

enlightenment of the present age." See, also, *Fulton v. Railway Co.*, 85 Ky. 640 (4 S. W. Rep. 332); *Stanley v. City of Davenport*, 54 Iowa, 463 (2 N. W. Rep. 1064).

The use of electricity causes no greater obstruction or hindrance, and imposes no greater burden, upon the streets than does the ordinary horse railway, except it be by placing posts along the streets,—a matter to be hereafter discussed. The electric car does not occupy as much space upon the street as does the car with the horses attached. It is not more noisy, is cleaner, is started and stopped quicker, moves faster, is more readily controlled, and, by its more rapid carriage of passengers, relieves the street, to some extent, at least, of travel. These are matters of common observation. Its advantages over horse-power are apparent. But it is most severely attacked because it is dangerous, and evidence of accidents, caused by it in this and other states, was introduced by the defendants. Some of this evidence, it appears, was used in the courts of other states, where the use of this power was sustained. It has not, however, been shown in this suit to be so dangerous as to justify the court in enjoining its use. The electric railway is now in use in nearly all the large cities and many of the smaller ones of the country. I am not aware that any court has yet enjoined its use on the ground of danger. Steam annually causes the loss of many lives and great destruction of property; yet no one has ever sought for that reason to enjoin its use as a motive power in transportation. This matter may be safely left where the Legislature has left it, to the municipal authorities, who presumably will not permit the use of those things which cause unnecessary danger. The Legislature has expressly conferred upon the cities of this State the right to authorize the use of any motive power whatever upon their street railways. Under this power exists the right to authorize the use of

electricity. *Williams v. Railway Co.*, 41 Fed. Rep. 556.

Defendants' counsel cite as an authority *Omaha Horse Ry. Co. v. Cable Tramway Co.*, 30 Fed. Rep. 324. The language then used by Judge Brewer must be considered in connection with the facts. The question there involved was not whether a horse-railway company might use any other motive power, but whether, being by its charter limited to the use of horse-power, it might restrain another company from using any other power. The complainant in that case was given the exclusive right to build, erect, and operate horse-railways within the city of Omaha, and five miles adjacent thereto. This was under a special charter from the legislature of the territory of Nebraska. The defendant was proceeding to construct a cable road, and the complainant sought to enjoin its construction and use on the ground that the defendant's road was included in the term "horse railways." In the opinion is this language:

"Is it probable that it [the legislature] intended to foreclose the public in advance from all the benefits of possible inventions and discoveries in the matter of street-railway travel, and give them to this grantee? or did it not rather intend that its grantee should take that complete and single thing known as a 'horse railway,' with all of which it was familiar, and *retain for the public all of the unknown possibilities of invention and discovery in reference to modes of street-railway travel?*"

In the present case, under the authority of the Legislature, the people are reaping the benefit of just such inventions, the use of which is authorized by the broad and comprehensive language of the act, as was evidently intended.

4. This brings us to the important question, viz., does the use of the street for street railways impose such new burden and servitude, additional to what was implied by the dedication, that it is beyond the power of the city to

authorize their construction without additional compensation to abutting lot-owners? As already shown, no restrictions are placed upon the city in granting these franchises. The lot-owner sustains a threefold relation to the street:

1. As one of the general public.
2. As owner of the reversionary interest to the center of the street.
3. As owner of a lot, possessed of the right of ingress and egress to and from the street.

In the first relation he has the right, in common with every other member of the public, to the use of the street. The fact that vehicles pass along the street upon tracks level with the bed of the street, and leaving sufficient room for him to pass on foot or with his vehicle, does not interfere with this right. The fact that he is compelled to turn aside, when meeting or passing a car upon the track, is an incident to the use of the street, but no infringement of any right possessed by him. He is not thereby hindered, delayed, or obstructed in his passage. Free passage is all the law gives him.

In condemning land for the use of streets and highways, the owner receives as damages the full market value of his land. After it has been condemned or dedicated, there is no such thing as damage to his reversionary interest, caused by any use which is a public one. Whatever may have been the ancient adjudications limiting the rights of the public in the streets to passage and repassage, and whatever may now be the rule with regard to highways in the country, with the growth of population in our cities have come increased needs for heating, lighting, draining, sewerage, water, etc., and with these has come also a corresponding extension of the public rights in the streets. Immense sewers and water mains may be dug, and the soil removed, culverts and drains

constructed, without compensating the abutting owners. It may now be considered the well-settled rule that the streets of a city may be used for any purpose which is a necessary public one, and the abutting owner will not be entitled to a new compensation, in the absence of a statute giving it. Ang. Highw. § 312; *Town of Palatine v. Kreuger*, 121 Ill. 74 (12 N. E. Rep. 76); *Murray v. Commissioners*, 12 Metc. 455; *Pierce v. Drew*, 136 Mass. 75; *City of Boston v. Richardson*, 13 Allen, 146.

So far, then, as these defendants are concerned, it is immaterial whether they or the city own the fee in the street. Their rights are the same in either case. So long as they are unobstructed in the use and enjoyment of their property, having convenient ingress and egress, and the use of the street is an authorized and proper public use, they have no legal cause for complaint. It is evident that street railways, when constructed so as not to interfere with the rights of others upon the street, form no obstruction to such use and enjoyment. They make no more noise than the omnibus or other heavy vehicles, are not more dangerous, and no more interfere with access to the abutting lots. They constitute a modern and improved use only of the street as a public way. These improved methods become necessary in populous cities. The use is the same; the methods only different. Without them, clerks and working men and women could not be provided with cheap and rapid transit from their working places to the suburbs of the city, where they may have cheap and comfortable homes. These views are in accord with the clear weight of authority. *People v. Kerr*, 27 N. Y. 188; *Kellinger v. Railroad Co.*, 50 Id. 206; *Mahady v. Railroad Co.*, 91 Id. 148; Pierce, R. R. 234; *Elliott v. Railroad Co.*, 32 Conn. 579; *Hinchman v. Railroad Co.*, 17 N. J. Eq. 75; *Attorney General v. Railroad Co.*, 125 Mass. 515; *Eichels v. Railway Co.*, 78 Ind. 261;

*Hobart v. Railroad Co.*, 27 Wis. 194; *Brown v. Duplessis*, 14 La. Ann. 843; *Railway Co. v. Railway Co.*, 31 Kan. 660 (3 Pac. Rep. 284); *Smith v. Railroad Co.*, 87 Tenn. 626 (11 S. W. Rep. 709); *Citizens' Coach Co. v. Railroad Co.*, 33 N. J. Eq. 267; *Briggs v. Railroad Co.*, 79 Me. 363; *Taggart v. Railway Co.* (R. I.), 19 Atl. Rep. 326; *Clement v. City of Cincinnati*, 16 Wkly. Law Bul. 355; Cooley, Const. Lim. (6th ed.) 683; 2 Dill. Mun. Corp. § 772; Mills, Em. Dom. § 205. They are also in accord with reason and common sense. It is the view unanimously adopted by this Court in *Grand Rapids & I. R. R. Co. v. Heisel*, 38 Mich. 62 (decided in 1878). It is true that this question was not directly involved in that suit, but the extent of the use of streets was involved. The question appears to have been carefully examined by the Court, and the authorities are cited. While it may be termed *"dictum,"* still it comes to us as the deliberate opinion of the learned Justices who then constituted the Court, and as such is entitled to great weight. That decision clearly voiced the practical construction which had theretofore been placed upon these laws by the people, and upon the faith of which many such roads had been built in many cities of the State, and vast sums of money invested.

We are cited by defendants' counsel to *Taylor v. Bay City Street Ry. Co.*, 80 Mich. 77. The distinction between that case and the present one is too clear to require comment. The former was decided upon the express terms of the charter of Bay City. The charter of the city of Detroit contains no such provisions. The question here involved was not there even discussed.

5. It is also insisted that the poles interfere with access to the abutting property, and therefore constitute an invasion of private rights. It cannot be seriously claimed, under the evidence in this case, that these poles inter-

fere with the present occupancy of the land; this is virtually conceded; but defendants insist that, in platting lots and selling them, it will, be necessary to take them into consideration. This is a contingency which may never happen, and therefore no damage may ever result. Should it ever happen, the common council have ample power to require and compel these poles to be so placed as to create no such interference. Failing in this, the defendants have an ample remedy in the courts. Such contingencies are too remote to form any basis for an injunction or for damages.

It has frequently been held that telegraph and telephone poles are not necessarily erected to facilitate the use of the streets, and consequently that they create an additional servitude. But the authorities are by no means uniform. To the contrary are *Julia Bldg. Ass'n v. Bell Tel. Co.*, 88 Mo. 258; *Pierce v. Drew*, 136 Mass. 75. These decisions are based upon the doctrine that the whole beneficial use of the land has been taken and appropriated to the public, and that one of the original uses of a highway was the transmission of intelligence. One of the first cases to make this distinction was *Taggart v. Railway Co.*, *supra* (decided in January, 1890). Referring to this case, Judge Dillon says:

" The distinction    *    *    *    is so fine as to be almost impalpable, and it suggests serious doubts whether both conclusions are sound and reconcilable. The general subject awaits further development and settlement." 2 Mun. Corp. (4th ed.) p. 893, note.

The learned author does not state which he believes to be the correct principle. Since then the question as to whether the erection of poles for electric street railways constitutes an additional servitude has been several times before the courts, and thus far they have been held to be ancillary to a proper use of the street, and to create

no such additional servitude. *Louisville, etc., Manfg. Co. v. Railway Co.* (Ky.); *Halsey v. Railway Co.* (N. J.), 20 Atl. Rep. 859; *Pelton v. Railroad Co.*, 22 Wkly. Law Bul. 67; *Lockhart v. Railway Co.* (Penn.), 21 Atl. Rep. 26.

These poles used, by the complainant are ·a necessary part of its system. When they do not interfere with the owner's access to and the use of his land, we see no reason why they should be held to constitute an additional servitude. Certainly they constitute no injury to his reversionary interest. To constitute an additional servitude, therefore, they must be an injury to the present use and enjoyment of his land. But they do not obstruct his light or his vision, as do the structures of an elevated railroad. Neither they nor the cars they assist in moving cause the noise, steam, smoke, and dirt which are produced by steam-cars. They do not interfere with his going and coming at his pleasure when placed as they can and must be, so as to give him free access. Wherein, then, is he injured? If it be said that they are unsightly, and therefore offend his taste, it can well be replied that they ·are no more so than the lamp-post or the electric tower. It is as necessary that rapid transit be furnished to a crowded city as it is that light should be furnished to its streets. Public convenience and necessity must control in all such cases.

6. We have thus far discussed the questions involved upon the assumption that sufficient room was left to permit the free passage of teams and vehicles when the cars were upon the track. It is claimed by the defendants that this space is not sufficient for that purpose. If this be so, it is evidently owing to the condition of the street, which is neither graveled nor paved, and to the nature of the soil, which in wet times is very muddy and difficult to travel. Such was its condition at the time this

controversy arose, and it so continued during all the time to which the testimony was directed. The complainant's track is in the center of the street. Its grade was established by the city engineer, and presumably the grade of the street, ·when established, will be the same as the grade of the railway. The poles are about 21 feet 7 inches from the center of the road, are placed between the ditch and the sidewalk, and average 10 feet 4 inches from the fence line. The track is 4 feet 8 inches wide, and the cars are the same width as the ordinary horse cars. The distance from the rail to the pole is about 19 feet. This space is ample for the passage of teams and vehicles, if the street were properly graded. The evidence upon this branch of the case is entirely unsatisfactory, and insufficient to enable us properly to determine the question. It is apparent, both from the opinion of the learned circuit judge and the exhaustive briefs of counsel, that this was a matter of minor consideration in the court below, the main desire being to settle the other important questions involved. The road-bed and track were first constructed, and no steps were taken to enjoin the complainant when engaged in that work, and no objection appears to have then been made. No trouble arose until the complainant commenced to erect its poles, which were at first claimed to have been erected outside the street limits upon the defendants' lands, but which are clearly within such limits.

Under this record we can only announce some general principles, leaving the defendants without prejudice to pursue such remedy as they may have when they can establish a violation of their legal rights.

1. The complainant cannot lawfully construct and operate its road in a street too narrow to admit the passage of its cars and other vehicles at the same time, nor so

construct it as to interfere with the rights of the general public in the street. *Grand Rapids St. Ry. Co. v. West Side St. Ry. Co.*, 48 Mich. 433.

2. Nor in a street, though of sufficient width, if its condition be such that the operation of the railway will result in the practical exclusion of others from the use of the street. A railway so constructed and operated would be a public nuisance, and the courts would abate it.

3. The complainant's road-bed and track must be built substantially with the level of the street, so as to permit vehicles to cross without difficulty.

4. The poles must be so placed as not to interfere with the right of ingress and egress to abutting property.

It is insisted that the court was in error in excluding testimony as to the dangers and actual perils witnessed by persons from the use of the new method of transit, for the reason that this testimony had a bearing upon the interference with the customary use of the street. This question arose three times upon the hearing. On the first two occasions the testimony ruled out referred entirely to the tendency of these cars to frighten horses. The court made its third ruling at the close of the testimony of one Mrs. Rascher, who had testified to the decrease of travel upon the street, to the frightening of horses, and the decrease in rents. The court then announced that eight or ten witnesses had testified to the condition of the road, and no more testimony would be allowed on that point. Defendants' counsel announced that they had a large number of witnesses to the same effect, and asked permission to call two or three more. The court said that five or six witnesses to any particular fact was sufficient, and that it was clearly within its discretion to limit the number of witnesses; that as to the points already covered defendants would not be permitted to call more witnesses, but as to any new facts they might call more. The circuit judge was clearly

right in this exercise of his discretion. Beyond this exercise of discretion the court, upon the hearing in equity cases, can exclude only such testimony as is scandalous and impertinent.

The decree of the court below is affirmed, with the costs of both courts.

LONG, J., concurred with GRANT, J.

CHAMPLIN, C. J. I am not prepared to say that the construction of a street-railroad track in a street is of itself no additional burden or servitude upon the street. I think it is, but to what extent depends upon all the facts and circumstances under which it is imposed. If the circumstances are such that in a narrow street, or in the mode of construction, it becomes a nuisance to the property-owners or the public, as pointed out by my Brother GRANT, I think the additional servitude would be quite apparent. If in any case it is such an invasion of private rights as to cause damage to the owner of the fee of the soil or abutting proprietors, I think they have a legal remedy to recover such damage in a suit at law. And so with regard to the setting of poles to aid the propulsion of cars by electricity. I do not think, ordinarily, it is such a taking of private property as requires condemnation and compensation before the poles can be set, but, I think, if the owner suffers damage on account of the erection of poles, he should seek his remedy at law for such damage.

I concur in the result reached by my Brother GRANT for the reasons—

1. That the complainant was proceeding under color of legal authority to construct its railroad.

2. I think the defendants have a complete legal remedy for all injuries complained of in their cross-bill.

MCGRATH, J. (dissenting). I cannot concur either in

the result arrived at by the majority or in the reasoning or conclusions of Mr. Justice GRANT.

The case hinges upon the question as to whether or not the construction and operation of a street railway in a street, and, as incident thereto, the placing of poles therein upon which are to be stretched electric wires, is a new servitude; and I am clearly of opinion that a street railway, whether operated by animal power, electricity, or steam, is an additional burden; and it seems to me that the exemption of any street, whether narrow or not, is a practical concession to this view. If it is or can be an added servitude in any street, however narrow, it must be in any street, however wide, the only difference being one of degree. If the width of the street is to determine, just what width shall determine the question? If the right exists to grant a franchise in one street, and the exercise of that right concludes the abutting owner, why not in any street? Any fixed right of way in a street is a new burden upon that street. Any use of a street, a like use of which is not common to all, is a new servitude. Any use of a street which narrows the street, or which interferes with the use-of any part of the street by the public, or confines the public to a use of but a part of the street, is an added burden. Any use of a street which increases the danger of a common use of that street is an additional servitude. Any use of a street which interferes with its use by the public is a use affecting the abutting owners.

The value of property upon a street is materially affected by its width, by the portion thereof devoted to public travel, by the facilities afforded for ingress and egress, and by anything and everything that interferes with a common use of the street, or the abutting owner's access to it, or which obstructs his view, or interferes with the utility or beauty of his premises. He is entitled

to every use which is not inconsistent with the public use, and to every use which is not inconsistent with such a use as is common to all. A street railway lays its track upon the surface and in the center of a street. It appropriates just so much of the street to its use, and to a use which is practically exclusive. It divides a wide street into two narrow streets. The portion of the street occupied by its tracks can only be used with increased danger. It cannot be crossed without danger, nor without the exercise of great care. Wheels and axles of vehicles are being constantly broken by attempting to drive on its way, or along or across its way, and the only answer which the street railway or the municipality makes to the injured party is, "Keep out of the track." It has been held that a line of omnibuses will not be allowed to run regularly upon street-car tracks, to the injury of the business. *Railroad Co. v. Citizens' Coach Co.*, 31 N. J. Eq. 525.

Streets are laid out not only with reference to road-way, but to sidewalks and margins for ornamentation. A street is laid out 50. feet wide, with a 25-foot road-way, and $12\frac{1}{2}$ feet on each side for sidewalks and ornamentation. A street-car track is laid through the center of the road-way, leaving practically but less than 10 feet each side of the track, insufficient for two teams to pass each other, and insufficient for one team to pass on that side of the street, if there should be a street-car approaching, and a team hitched at the curb. Cars moving along these tracks have practically the right of way. They turn out for no one's convenience, and are practically moving obstructions in the street, discommoding other vehicles, and adding materially to the hazard of travel. The abutting owner cannot unload a load of freight or hitch a horse in front of his own door without increased risk. Because of the existence of these

tracks, road-ways are being constantly widened at the expense of sidewalks and ornamental grounds and ornamentation. If the local legislature has the right to permit the laying of a single track, why not of two tracks, or of four tracks?

Mr. Lewis, in his recent work on Eminent Domain, says:

"That a difference exists between the ordinary horse railway and the ordinary steam railway is obvious; but is the difference anything more than one of degree? The essential characteristic of both kinds of roads is that there is granted to a private corporation or individual an exclusive franchise, right, or easement in the soil of the street. * * * If the principle of the horse railroad cases is sound, then a street may be so filled with tracks, with cars running so frequently, as practically to exclude all other travel and traffic from the street." Chapter 5, § 124.

If a lot-owner has a frontage of 30 feet, he is entitled to 30 feet of unobstructed approach. If the council may grant the right to erect poles 100 feet apart, why not 50 or 25 or 12 feet apart? And then, why not the right to place cross-trees on the top of these poles, and ties upon the cross-trees, and stringers upon the ties, and all the incidents of an elevated railway? If the increased needs of the municipality is to be the test, then the legal rights of the abutting owners must vary with place and varying population. An elevated railway in one of the populous streets of New York is as much a necessity there as is a surface railway on the street in question. A public highway is one over which all the people of the State have a common and equal right to travel. It is a way in which no one has the exclusive right to travel, nor the exclusive right to use it in a particular manner.

What is said by Dillon, regarding the use of a street by a steam railway company, is true in a sense of a street railway company:

"A different use of the land from that for which it was intended cannot be justified on the ground that a railway is an improved highway. Railway companies are only public corporations in a limited sense. The right of way, the road-bed, and the carriages propelled thereon are owned by private individuals, and not by the public. Fares are charged for travel thereon, for the exclusive benefit of the parties owning the road. They are constructed and equipped in the interest of private speculation, but at the same time they are intended to subserve the public good. The travel on them bears no analogy to our notions of travel on an ordinary street or highway, where every one travels at pleasure, in his own conveyance, without paying tolls or fares. The uses are totally different, and even inconsistent. The one is exclusive, in favor of private interest, and the other is open and free to all." 2 Dill. Mun. Corp. (3d ed.) § 704.

The defendants here are protesting against the occupancy of that street by the railway company with its tracks, poles, and wires, and it is notorious that, in a number of instances in the city of Detroit, the residents of streets have vigorously opposed construction of lines of street railway in front of their property. At the present time a petition is before the common council of that city for a franchise to construct an electric railway on Howard street, and the residents of that street have presented to the council the following reasons why the franchise should not be granted:

"1. That the street is too narrow of its present width to warrant the erection of such without placing in jeopardy the lives of every resident along said street.

"2. That, in the event of a street railway along said street, the property from commencement to terminus will be depreciated in value.

"3. That to undertake to widen said street, as has been suggested by some of the petitioners, would not only depreciate property along the street, but would destroy the shade-trees upon both sides, which are not only a benefit, comfort, and luxury, but have taken years of care and attention to cultivate.

"4. That Howard street is the only street which we have to drive up from the center to the western portion of the city with any degree of comfort, on the western side of city, south of Grand River avenue.

"5. That, in the event of an ordinance being granted for a street railway along said street, the street would be absolutely destroyed for residence purposes, as has been shown by improvements along such street compared with the portion already burdened with a street-railway track between Seventh street and Trumbull avenue.

"6. That the erection of a street railway, as contemplated by petitioners, would be endangering the lives of every child along said street, who feels more or less free at present to step outside its place of abode.

"7. That the voluminous remonstrance against the same, presented to and now before your honorable body and committee, is a sufficient indication that the residents of said street have no desire for such.

"8. That not a single individual has as yet petitioned for a line along said street, which is of itself a sufficient warrant that our present street-railway accommodations are very satisfactory to all who live on said street.

"9. That the recent decision of our Supreme Court pertaining to the erection of electric street-railways, through and along streets similarly situated as Howard street, is not justifiable, and cannot be done by the mere asking for and granting of the same.

"10. That, above all, it is not of a public necessity:

"Thefore be it resolved that these resolutions be adopted, and a copy be presented by a committee of three, to be appointed at this meeting, to the common council, and the committee on streets and ordinances."

Is it within the province of this Court to say to these property-owners, "You do not know what you do not want?" to say to them that, as a matter of law, the railway will not be a new servitude? to suggest that this occupancy and use will not depreciate their property, will not bring a new danger to their doors, but will be an advantage to them? to declare, as a matter of law, that this occupation of this street is a public necessity, whereas the public have not asked for it?

It may be conceded that street-car service is a public convenience, but the necessities of the public must be supplied at public expense. The Legislature has no right to say that the property of the individual may be taken or injuriously affected for the public good without compensation. Public convenience is not to be subserved at the expense or disadvantage of the private citizen. The Constitution provides not only that private property shall not be taken without compensation, but it also provides that it shall not be taken at all, unless the necessity for the taking shall first be found by a jury or a commission appointed by the court. As was said by Mr. Justice CAMPBELL in *Powers' Appeal,* 29 Mich. 510:

"No legislation can be maintained which does not plainly require this question to be left to a jury."

The street itself is the major necessity, yet the land taken for streets in a majority of cases is just what must ultimately be given in order to the beneficial use of the remainder; yet, if the public demands it before the owner chooses to give it, the public must pay for it, and those who have dedicated their own land for street purposes are assessed to pay for the taking. Nor is it true that rapid transit or street-railway transit is as necessary as light or sewerage or water, for these are actual necessities, while these methods of transit are simply conveniences. The common council has a right to provide that sewerage shall be directed to and through the public sewers, but it has no right to determine that transportation shall be confined to street-railway cars. The lighting of the streets is necessary for the protection of the public and municipality as well. The public and the city are interested in having water for convenient use, whether used by abutting owners or not.

But it is said that this is not a taking of property,

within the meaning of the Constitution. Property is the right to the beneficial use and enjoyment of a thing, and the right to dispose of that beneficial use and enjoyment. Any thing which impairs that use and enjoyment is a taking. The opening of a street may not divest the owner of the fee, yet it is a taking and appropriation. In *Grand Rapids Booming Co. v. Jarvis,* 30 Mich. 320, Mr. Justice CHRISTIANCY says:

"It is a transparent fallacy to say that this is not a taking of his property, because the land itself is not taken, and he utterly excluded from it, and because the title, nominally, still remains in him, and he is merely deprived of its beneficial use, which is not the property, but simply an incident of property. Such a proposition, though in some instances something very like it has been sanctioned by courts, cannot be rendered sound, nor even respectable, by the authority of great names. Of what does property practically consist, but of the incidents which the law has recognized as attached to the title or right of property? Is not the idea of property in or title to lands, apart from and stripped of all its incidents, a purely metaphysical abstraction, as immaterial and useless to the owner as 'the stuff that dreams are made of?' Is it not a much less injury to him, if it can injure him at all, to deprive him of this abstraction, than of the incidents of property, which alone render it practically valuable to him? And among the incidents of property in land, or anything else, is not the right to enjoy its beneficial use, and so far to control it as to exclude others from that use, the most beneficial, the one most real and practicable idea of property, of which it is a much greater wrong to deprive a man than of the mere abstract idea of property without incidents? This use, or the right to control it with reference to its use, constitutes in fact all that is beneficial in ownership, except the right to dispose of it; and this latter right or incident would be rendered barren and worthless, stripped of the right to the use. Property does not consist merely of the right to the ultimate particles of matter of which it may be composed,—of which we know nothing,—but of those properties of matter which can be rendered manifest to our senses, and made to contribute to our

wants or our enjoyments." See *Eaton v. Railroad Co.*, 51 N. H. 504.

The same cases which hold that a horse railway is a proper use of a street declare that a steam railroad is not, and that the occupation of a street by a steam railroad is a new servitude; yet the use by the steam railroad is within the same limits as that of the horse railroad. The burden may not be as' great in the one case as in the other, but there is no difference in the principle. In this State the fee is in the abutter, and he has, in addition, a greater interest in the easement in front of his own property than the public generally; but, whether he has the fee or but an easement, a burden upon either affects a property right.

It is urged that this use of streets "must be supposed to have been contemplated." Is it possible that a use of a street which is not common to all streets, and which depends upon the desire of a street-car company or the will of a common council, must be supposed to have been contemplated? Can this special use, depending upon the question of profit to its promoters, be deemed to be one of the ordinary purposes for which property for a street was taken? Can it be that the use of a street as a mere outlet for a traffic which, in the absence of that use, would be distributed over several streets, can be said to be a use contemplated at the opening of that street? Is it true that all the traffic of a given territory embracing a number of streets may be directed upon a given street, and a system of transportation adopted which interferes with the other and ordinary modes of travel upon that street, and the other streets relieved at the expense of that street, and yet that this system of transportion is not a new burden?

In a street-opening proceeding, the measure of damages is the value of the property taken, and the physical

injury to what is left; but in the condemnation of lands
for railroad purposes another element of damages is con-
sidered, viz., the consequential injury to the remaining
estate growing out of the mode and nature of the use.
The very existence of these different rules clearly indicates
that, in the street-opening proceeding, no possible conse-
quential injury was contemplated. The continuing con-
sequential injury has always been treated as an element
of the taking, and it has been held that a use of the same
right of way by another steam railroad was a new servi-
tude, although the damages must necessarily be conse-
quential. *Railroad Co. v. Reed*, 41 Cal. 256. The Leg-
islature cannot authorize either a direct or consequential
injury to property without compensation to owners. It
will not be claimed, even in the presence of this new use
of streets, that it would be competent to permit a jury,
in a street-opening proceeding, to consider the probable
or possible use of a street for street-car purposes. The
person whose land has been taken for a street has been
compensated for the land, but he has also been assessed
for the very benefits which this use deprives him of.
Usually the benefits are assessed upon a limited territory,
and not upon the public generally.

I am unable to reconcile the opinion of Mr. Justice
GRANT with the case of *Taylor v. Bay City Street Ry.
Co.*, 80 Mich. 77. That was a bill filed by abutting
owners to enjoin the construction of a street railway.
The court below dismissed the bill, but this Court made a
decree restraining the defendant from the use of the road
in front of complainants' premises. The decision was
put upon the ground that the charter of Bay City em-
powered the council of that city to authorize the run-
ning of street railways in the streets of said city upon con-
dition that the owners of lots adjoining, and persons
interested therein, should receive compensation therefor,

and the Court restrained the company until it had complied with the statute "requiring condemnation proceedings." The company acquired the right to construct its road in 1864, but the amendment to the charter requiring compensation to be made was not enacted until 1869. If it be true that the street railway imposes no new servitude, then the statutory proceedings requiring compensation and condemnation proceedings is a barren provision, and the decree of this Court requiring condemnation proceedings to be taken imposed a duty upon the railway company which could result only in annoyance to it. It was urged in that case, as strenuously as it is here, that the construction of a street railway in a street imposed no added servitude; hence the point was raised. The result is that abutting owners in Bay City are entitled to compensation because the statute has merely declared the remedy, while in Detroit they are not entitled to any remedy, because, as a matter of law, there is no injury.

This is not a question of whether or not the public shall have street railways or rapid transit, but it is one as to whether the owners of property shall be divested of its beneficial use and enjoyment without compensation, because a private corporation is attracted by the prospective revenue there is in the enterprise, and, upon the plea that it will be a great public convenience, has obtained a franchise to appropriate a portion of the street to its use. It is upon this same plea that the public, through its legislatures, has parted with about all it had that was of value, except its interests in the public highways, and it remains to be seen whether they, too, will be surrendered to monopolistic control, to the detriment, not only of the public, but of abutting land-owners as well. These owners have special interests in these ways which courts, at least, are bound to respect.

In this commercial age there is a growing tendency to avoid .those constitutional methods which are designed for the protection of property rights of individuals which should be checked, else courts will in time be powerless to protect the rights thus acquired from unlawful attack or abuse. The Constitution provides that private property shall not be taken until the necessity therefor shall have been first determined by a jury, and not then until compensation shall be made therefor. If the necessity for this use of our public streets is so pressing, there should be no difficulty in its determination by the methods pointed out by the Constitution, rather than by the desire on the part of the corporation to use the street for the purposes of revenue; and whether the injury to abutting property is slight or great is a matter of fact to be determined by a jury, upon proper consideration of the situation and circumstances of each case.

MORSE, J. In this case I concur most emphatically in all that has been said by Mr. Justice McGRATH in his dissenting opinion.

I am satisfied that the system of railway in operation upon Mack street does fasten a new burden upon the land of the abutting owners on that street. It introduces a new and dangerous element of locomotion, certainly not known, or even thought of, when the street was dedicated to public use, and for the purposes of public travel.

I know that the current of authority, what little there is of adjudication upon the subject, is to the contrary; but in every single case the reasoning of the opinion, to me, rests upon a false and dangerous foundation. It is that the rights of the individual must give way to the needs of the public, in the use of new discoveries and inventions to facilitate travel and rapid transit in the

great and growing cities of our land. But there is no public need that can, in right, be permitted to destroy or damage the property of the individual without compensation. The safety of this government, and of every community, rests upon the protection of the law to the rights of the individual man. Railroads and other corporations ought not, under any plea of the public convenience or the public welfare, to be permitted practically to destroy the dwelling-place of the humblest citizen, or to damage it, without compensation; and, when such an attempt is made, without any proposed compensation, and without the consent of the owner of the property, the strong arm of equity ought to interpose to save the rights of the individual thus threatened, without reference to the effect of such action upon the public, or its convenience.

The system of propelling street-cars by electricity, known as the "trolley system," burdens the street, in the first place, with a track wider than a wagon track, which is practically taken out of the street, away from the use of other travelers, and made the "right of way" of the street-car company. Poles are planted in front of the property of abutting owners, and upon these are strung wires, charged with a dangerous, and not entirely certain, force, the full nature of which is known to but a few, if any, and the full control of which has, as yet, not been given to man.

It has been held by the same authorities that consider a horse railroad not to be an additional servitude that a steam railway imposes a new burden. The only reasons given for the distinction are, as said in one case, that the question whether any use of a street was a new servitude was one of degree, and depended on the manner in which the streets were used; that in the case of steam

power to propel the cars there was noise and smoke, the trains were longer and heavier, and the speed was greater, than in the case of horse cars, and the use was practically inconsistent with other uses of the highway (*Railway Co. v. Doyle*, 88 Tenn. 747, 13 S. W. Rep. 936); and that it has been found by actual experience that the use of cars upon a street, propelled by steam, practically destroys the street for any other means or purposes of travel.

If the question to be considered, then, in determining whether or not the abutting land-owners upon the street are entitled to compensation, is the degree that the proposed use may prevent the street being used for the ordinary, legitimate purposes of public travel, certainly such a road as this electric road upon Mack street does impose a new servitude, for which the defendants are entitled to compensation before the road is laid; for, under the circumstances shown, it is a nuisance, and practically destroys the street, and with the destruction of the street the property of defendants is taken. The evidence shows that between the car track and the ditch of the street there is only from six to eight feet in many places; that the track is raised from four to eight inches above the center of the street; that it is almost impossible to pass a car with any vehicle without being ditched; travel has decreased on the street; coal, wood, meat, milk, and other wagons will not go upon the street; the wires are strung so low that a load of hay cannot pass under them. People are denied access to their homes by teams and vehicles, and residence property has greatly depreciated since the road has gone into operation. The cars run with greater speed, and therefore with greater danger, make more noise, emit sparks and flashes of light, and are more dangerous, frightening horses, and even people.

Under such circumstances, the use of these cars in this street, in its present condition, is a nuisance to the property-owners on its line, and to all the public who travel upon it by ordinary methods.

It is said that the city of Detroit can remedy most of these evils by grading and paving the street, and that the municipality can safely be trusted to do this. But the property-owner or traveler on this street has no way of compelling the city thus to remedy the evils of which he may justly complain, and is not bound, in my opinion, to wait and suffer without compensation, and without any tangible hope of relief.

It is bad enough, under the exercise of the power of eminent domain, to destroy or damage the home of the citizen, which he has planted upon the spot where he desires it to stand, when he is compensated for the pecuniary sacrifice; but it is a crime against him, and a violation not only of our Constitution, but of the very essence of liberty, to damage or destroy it without compensation, at the will of municipal or other corporations. And in my opinion, neither the city nor the Legislature can permit a private or public corporation practically to destroy an existing street without the intervention of a jury or commissioners to assess the damages to the abutting owners by such destruction. The city of Detroit has no authority to allow a street-railway company to obstruct the uses of a street. In such a case as the present, the street should have been graded and paved before the franchise was granted to the complainant.

This case, in brief, is this: Here is a land-owner upon a resident lot abutting upon a street, in the soil of which he owns the fee, subject only to a public easement which he, by dedication or otherwise, has granted for the ordinary and proper uses of a street or highway. When

he built his dwelling-house, abutting the street, and when he dedicated his land to the public use, such a thing as an electric railway was unknown, not only in operation, but even in the published thought of man. But the new discovery is made. Travel by the new method is more rapid, and therefore more convenient and useful to the public, than the old ways. And it requires money to operate such a road; there must be an aggregation of capital to organize and run it. A corporation is formed, and this corporation, asking only the leave of the public, represented by the common council of the city of Detroit, and against the protest of this resident land-owner and his neighbors, proceeds to lay its tracks in the middle of this narrow street, raising such track above the level of the street to conform more easily in the future to a proposed grade, plants its poles at the edge of his sidewalk in front of his residence, strings upon them wires from 13 to 18 feet above the ground, and commences running the cars. He must bring his wood, coal, hay, etc., upon some other street, as near to his residence as he can. He must bring his milk and meat home by hand. The value of his property is lessened, and his home becomes undesirable. He cannot sell, except at a sacrifice. In effect, his property is taken from him without compensation. When he goes into court he is informed that he cannot prevent this corporation from thus damaging his property, because the public demand, and must have, rapid transit; that his property cannot be protected, and his rights as an individual asserted, against this corporation, because the public are benefited at his expense. This is to me a new doctrine of eminent domain. The public need and are benefited by steam railroads; the progress of civilization would be checked and the world at a standstill without them; but they have never been allowed to acquire private

property except by purchase or condemnation. But here is an electric railway company permitted to take private property without consent or condemnation, and the land-owner is powerless to prevent it; and it is doubtful, from the opinions of some of the learned judges who have upheld such proceedings, if he can even seek relief, after the road is laid and operating, in a court of law, for the actual damages he has suffered. In my opinion, no legislative grant, or municipal authority under such grant, can thus deprive an individual of his interest in land, no matter how urgent the wants of the public. The need of the public cuts no figure when the question of compensation to the land-owner for the taking of his property is mooted. It can only be considered when the question of the right to take it at all is raised.

But it is said that, although the fee is in the abutter, the whole beneficial use of the land for the purposes of a street is in the public, and that for those purposes it does not belong to the individual at all. Still it must be conceded that the abutter retains his easements of light and air and access to his premises, and also the right of the ordinary ways of travel upon the street to and from his land. These are property rights, and for the loss of these he is entitled to compensation. Nor can he be deprived of his rights because a court may think the damage to him is but trifling. It is by inches that ells are obtained. In the case before us this railway company may be taking but a pound of flesh, but in the case of the home-owner it is the pound of flesh nearest his heart.

The question whether or not a street railway constitutes a new burden was not before this Court in the case of *Grand Rapids & I. R. R. Co. v. Heisel*, 38 Mich. 62, and what was said in that case by Mr. Justice COOLEY ought to have no binding force, except, perhaps, from the fact

that it has been acquiesced in for a long time by property-owners in this State. I agree with Mr. Justice McGRATH that the argument in favor of the proposition there laid down by Mr. Justice COOLEY is unsound.

It seems strange that the same courts that hold that the planting of telegraph or telephone poles in the street imposes a new servitude, and that they cannot be so planted without the consent of the owner, yet hold that the putting up of poles in the same places for an electric railway does not impose any new burden. The reason given is that telegraph and telephone poles are not used to facilitate the use of the streets for travel and transportation,—

" Whereas the poles and wires of the railroad company are directly ancillary to the uses of the street as such, in that they communicate the power by which the cars are propelled."

This distinction Judge Dillon has said "to be so fine as to be almost impalpable," and that "it suggests serious doubts whether both conclusions are sound and reconcilable." If it were not for the telegraph and telephone, the messages transmitted by them would have to go by mail or other carrier, and use the highways more or less therefor, and it needs but a little further extension of the principle laid down in the case of railway poles to include also telephone and telegraph poles. Indeed, the courts of two states have adopted such extensions, and hold that the land-owner is entitled to no compensation for the erection of the latter poles in the street. *Pierce v. Drew*, 136 Mass. 75; *Julia Bldg. Ass'n v. Bell Tel. Co.*, 88 Mo. 258. If this principle is to prevail because of the needs of and benefit to the public, our streets may be filled with street-car tracks, preventing other modes of travel, and poles may be so thickly planted along our sidewalks as even to exclude light and air from our

dwellings, and yet we shall have no remedy; for if one company may do anything of this kind another may. The only limit seems to be the legislative or municipal will; the individual is not a factor in the case; his rights have no weight with the law, although he is the one most vitally interested, if the old idea of the sacredness of his right to his home is not a myth or a humbug.

The argument may be amplified in many ways, as it has been, to sustain the idea that an electric railway does not impose a new burden upon the land; but the facts remain, that no land-owner wants such a railway upon his street in front of his home; that it is a means of travel not contemplated when most of our streets were dedicated; that the poles are unsightly, and a damage to the premises of the abutter; that the wires may and have been the means of injury and death; that the cars are more dangerous than horse-cars, and more liable to frighten animals; that such a road depreciates the value of land as residence property upon the line of such road; and that it is a positive damage to the abutting land-owner. Why, then, is not his property taken within the meaning of the Constitution, and taken without compensation? Why should his property rights be disregarded? It can only be justified, as before said, upon the plea that the convenience of the public is so paramount to the rights of the individual that the property of the latter must be sacrificed without recompense for the benefit of the public.

We have heard this argument before. It has been more than once made in this Court in favor of the great lumber corporations of this State. It has been contended that the lumbering interests of this State were so extensive, important, and valuable, and so identified with the interests of the public, that the poor farmer, with a small piece of land upon a navigable stream, must bear

the servitude and burden of damage to his land by the flooding of the streams and running of logs, without compensation, because the public would be benefited thereby. While this argument has been listened to, it has never as yet been accepted by this Court as sound doctrine, and thus far the poor and the weak have not been denied the equal justice of our laws. *Witheral v. Booming Co.,* 68 Mich. 57, 58.

The doctrine contended for is but a new phase of the old idea that "the king can do no wrong." It cannot prevail in a free government. The individual, in a republican form of government, is the one to be protected and guarded, and in his protection lies the security of liberty to the whole people. If the need of the public demands this kind of a railway for rapid transit, then the public can afford to pay for the privilege of destroying the property of the individual citizen. In no other case that I know of has the home of the individual been permitted by the law to be damaged without recompense, that the public might reap a benefit. If the need of the public is such that it must have this particular method of transit, that need will furnish corporations with the means to repay every private citizen for the loss and damage that his property must suffer to accommodate such public need.

The plea that electric railways will not be built, unless the property of abutters upon the street is permitted to be taken or damaged without compensation, is too puerile to be considered as an argument in favor of the destruction of private rights.