THE PATERSON RAILWAY COMPANY

51   213
52    37
57L 294

51   213
62L 736

v.

JOSEPH C. GRUNDY et al.

The Paterson Railway Company constructed a street surface railway in River street, in the city of Paterson, which they operated with horses. One of the charters under which the company was organized provided that the cars might be operated by such motive power as the company might "deem expedient and proper." Having determined that it was necessary for the securing of more rapid transit to substitute electricity for horses as the propelling power of its cars, the company obtained the consent of the municipal authorities of Paterson, and proceeded to erect the appliances for transmitting the electrical current to the cars. In doing this they put up a pole at the edge of the curb on the sidewalk, on the property on either side of defendant's on River street, and strung a wire between the poles at a height of twenty-two feet above the sidewalk. Defendant having cut the wire over his sidewalk and threatened to do so again, the company applied for an injunction to restrain defendant from interfering therewith.—*Held,* (1) That the Paterson Railway Company are authorized to construct and maintain a street surface railroad on River street, in the city of Paterson. (2) Except for the requirements of the Subway Commission act (*P. L. of 1892 p. 78*), the Paterson Railway Company had, from the original charter (*P. L. of 1866 p. 1068*) and the supplement thereto (*P. L. of 1870 p. 529*), the act concerning street railroad corporations (*Rev. Sup. p. 369*), and the consent of the city authorities of Paterson, the right to use electric motors for the propulsion of its cars, and to erect and maintain the necessary appliances for the transmission of the electrical current to the same. *Halsey* v. *Rapid Transit Street Ry. Co., 2 Dick. Ch. Rep. 380,* followed. (3) If complainant has legislative sanction, the defendant's right, as an adjacent owner, to interfere with the wire of the company strung over his sidewalk, depends on whether there is, therefrom, such an interference with his right of access and light and air over the street as to impose an additional servitude on his land and entitle him to compensation. (4) An abutting owner is entitled to have the way of access to the upper stories of his house kept free from obstructions which will prevent its use in emergent cases, or which cannot be quickly displaced in such emergency without serious danger to life or person. (5) A privilege granted to a corporation of a partial use of the public highway, which threatens, if it does not encroach on, the property rights of the adjacent owner, should be so exercised as to minimize the inconvenience and danger to the enjoyment of such rights. (6) The Subway Commission act is so far clear and operative that the complainant cannot exercise its right to erect and maintain structures on or over a public highway to transmit the electrical current to its cars, without the consent first obtained of said commission.

On order to show cause.

Mr. *John W. Griggs*, for the complainant.

Mr. *David J. Berry* and Mr. *George S. Hilton*, for the defendants.

GREEN, V. C.

The complainant, the Paterson Railway Company, was formed by the consolidation, under the act of 1888 (*P. L. of 1888 p. 74*), of the Paterson City Railway Company, the Paterson and Passaic Railroad Company and the Haledon Horse Railway Company, three corporations operating street railways in the city of Paterson and its vicinity, at the time of such consolidation on April 28th, 1888.

The Paterson City Railway Company was organized under the provisions of the statute (*Rev. p. 922 § 76*) by the grantees in the deed of the master, under proceedings of foreclosure and sale of the property and franchises of the Paterson and Little Falls Horse and Steam Railroad Company, which were included in a mortgage executed. by the said company to secure the payment of bonds issued by it. This last-named company was incorporated by act of the legislature, approved April 9th, 1866. *P. L. of 1866 p. 1068.* A supplement to the said charter was passed by the legislature and approved March 14th, 1870. *P. L. of 1870 p. 529.* The original charter gave the company authority to operate its cars by such motive power as it might deem expedient and proper. Prior to the foreclosure and sale of its property and franchises, it had built and was operating a surface railroad on various streets in the city of Paterson, including a portion of River street.

The bill alleges that the complainant corporation being of opinion and having determined that it was expedient and proper to operate its railway system by the application of electricity to electric motors for the propulsion of its cars, instead of horse power as formerly, adapted two of its routes to that method and was engaged in preparing to put it in operation on its railway

on River street, embracing the section of that street on which defendant, Joseph C. Grundy, owns several lots.

The allegations of the bill, with reference to the adoption of the plan and the method of its practical application, are substantially as follows: The company, in the exercise of the discretion confided to it, and in discharge of its duties to use its public franchise for the transportation of passengers in the most commodious and advantageous manner, has decided and does deem that it is necessary for the securing of more rapid transit to substitute electricity for horses as the propelling power of its cars; and that as a matter of fact there is now but one safe and practical system known and in operation for supplying the electrical current to the cars, and that is what is known as the trolley or overhead system; that the system of electrical motors used by the company is that known as the trolley or overhead system, which consists of iron posts set near the curb line in the sidewalk of the street upon which insulated wires called feed-wires are stretched at a height of about twenty-two feet above the street; two other wires called the trolley-wires are stretched above the tracks and are connected at intervals by cross wires with the feed-wire; a rod or arm extends from the car and connects with the overhead trolley-wire; through said rod the electrical current is transmitted from the overhead wire to the running gear of the cars.

The bill further alleges that the company, at the time of filing the bill, had nearly completed the erection of the poles and stringing the wires along its line, from its terminus in River street, through River street, a distance of about three-quarters of a mile, in which work it had expended a large sum of money, and that the line was nearly completed and ready for use to be operated under the trolley system.

In these preparations the employes of the company had strung a feed-wire along and over the sidewalk, near the curb line, in front of lots Nos. 557, 559, 561 and 563, River street, owned by the defendant, Joseph C. Grundy; the wire being, as alleged, one of the wires necessary for the operation of the trolley system by electricity adopted by the said company, and intended to be

used in propelling cars upon its tracks on River street. This wire was twenty-two feet above the surface of the sidewalk, and was attached at both ends to poles set in the ground at the edge of the curb on the sidewalk, one upon lands southwest of defendant's lands, and the other upon lands northeast of defendant's lands.

On the 7th day of June, James Grundy and John Grundy, brothers of the said Joseph C. Grundy, and by his direction, cut the wire stretched in front of the lands mentioned. To do this they put a ladder up against the limb of a tree, and James held a sledge hammer against the wire while John cut it with a chisel or some sharp instrument. The defendants threatening to cut the wire as often as it should be strung across that space, the complainant, the railway company, filed the bill in this cause for an injunction to prevent their so doing.

On the presentation of the bill, an order to show cause why an injunction should not issue in pursuance of the prayer, restraining the defendants from interfering with the said wire, was issued, with a restraining order forbidding the defendants from so doing until the further order of the court. A copy of this order was served upon the defendants by the deputy sheriff of the county of Passaic, but one of the defendants, notwithstanding the mandate of the court, again cut the wire, which had been replaced.

On the hearing of the order to show cause, the violation of the previous order of the court was brought to the attention of the court by motion to punish the party, of which notice had been given with copies of affidavits to be presented. This act was committed by one of the defendants, who was not the owner of the property, and the hearing of the order to show cause proceeded against the owner.

No answer was filed by the defendant, but affidavits of Joseph C. Grundy and John Grundy were presented, and the injunction was resisted on the ground that the complainant had no legal authority in the premises.

The affidavits show that the defendant, Joseph C. Grundy, objected to the company laying two tracks in River street, and

refused his consent to their putting up poles upon, or stringing wires across, his sidewalk unless compensation was made to him for the damages which would result from such use; that he notified the company to remove the wires after they had been strung, and that he would cut them if not so removed, and that John and James C. Grundy did cut the wire after waiting for the company to take it down. The claim is made by the affidavits that it would be impossible to raise a ladder up to the buildings in case of fire, or if the owner wished to paint or repair; that the tracks do not leave sufficient room between the rail and sidewalk for horses and wagons to safely pass while the electric railway may be in operation; that the tenants are incommoded, and that two of them have moved on account of alleged danger to the lives of their children; that the route of the original Paterson and Little Falls Horse and Steam Railroad Company did not go on River street, and that the only motive power used was by horses hitched to the cars, until the last two or three months, when the electric trolley system was first used.

The affidavits present no justification of the acts of the defendants, unless it is true that the complainant company has, without lawful authority, placed an obstruction on the highway, which any one may remove, or, without such authority, has invaded some right of the owner of the premises in a way to justify him in forcibly removing the obstruction so placed upon the use of his property.

The objection urged by the defendant's counsel was a want of legal authority in the complainant, first, to maintain a two-track or any railway on River street, and, second, to use electric motors, or erect and maintain on the streets the necessary appliances for the transmission of electricity to the cars.

Has the complainant lawful authority to maintain a street railway on River street? Whether such right is for two tracks or only one, cannot affect this controversy.

The complainant insists that, by virtue of the proceedings taken in pursuance of the act of 1886, it is vested with the rights, privileges and franchises of each of the three corporations which were consolidated into the complainant corporation.

The second section of that act provides that, on making the agreement of consolidation and filing the same or a copy with the secretary of state,

"the several corporations parties thereto shall be deemed and taken to be one corporation by the name provided in said agreement and act, possessing all rights, privileges and franchises and subject to all the restrictions, disabilities and duties of each of such corporations so consolidated,"

and by the third section,

"that upon the consummation of said act of consolidation all and singular the rights, privileges and franchises of each of said corporations parties to the same and all property, real, personal and mixed,  *  *  *  shall be taken and deemed to be transferred to and vested in such new corporation without further act or deed."

By the act of consolidation, therefore, the complainant was vested with all the rights, privileges, franchises and property at that time enjoyed, owned or possessed by the Paterson City Railway Company.

This latter company existed by virtue of the provisions of the statute providing for the incorporation of a new company by the purchasers of the franchises and property of a railroad under foreclosure proceedings. *Rev. p. 921.* Section 76, page 922, provides that a new corporation formed under that act, on complying with the provisions of the act,

"shall have and possess all powers belonging to corporations organized under the laws of this state, and all powers conferred by said laws upon the corporations whose franchises and property were sold, and bought as aforesaid, it shall receive, have and hold the railroad property and franchises within this state included within and bound by said mortgage or sold and purchased at said sale, subject only to all liens, contracts" &c.,

prior to the making of the mortgage, with a proviso that in no event shall such new corporation be deemed or construed to have acquired, by virtue of any such sale or purchase, any different rights, franchises or privileges from those possessed by said original corporation, and conveyed or intended to be conveyed by such mortgage as aforesaid.

By virtue of the proceedings of foreclosure sale and reorganization and the provisions of law, the Paterson City Railway Company became vested with the rights, privileges, franchises and property granted to the Paterson and Little Falls Horse and Steam Railroad Company under the original act of April 9th, 1866, and the supplement thereto, approved March 14th, 1870.

By the original act, section 7, the last-named company was authorized to * * * construct and operate a railway to commence at some point in or near the city of Paterson, in the county of Passaic, to Little Falls, in the county of Passaic.

By section 14, that the said railway may be constructed along the public road or highway within its route, upon obtaining the consent, in writing, of the township committee in which said route may extend, or a majority of them, and along any street in the city of Paterson, on obtaining the consent of the mayor and aldermen of said city, or a majority of them ; and whenever said railway is located on or across any street or highway, the said company shall, as soon as may be, restore such street or highway to such state or condition as not to impair its usefulness, and such railway and the rails thereof shall be constructed and maintained in such manner, and the rails thereof of such size and pattern as to impair, as little as practicable, ordinary travel on such street or highway.

By the supplement of 1870 the company were empowered to lay out and construct a single-track railway, with the necessary turnouts, through and along any streets and avenues in the city of Paterson, north of Market and Congress streets, and northwest of the Passaic river, in said city of Paterson ; *provided*, that the consent, in writing, of a majority of the owners of the land (reckoning by the number of lineal feet) fronting on both sides of said streets or avenues being first had and obtained and filed in the office of the clerk of the county of Passaic; and further, that the said railway shall not be constructed in any parts of said streets or avenues without the consent of the mayor and board of aldermen of said city for that purpose being first duly granted at a meeting of the board.

There is no dispute that River street, at the point in contro-
versy in this suit, is within the district named in the supplement.

The bill avers that prior to the construction of the road in
River street, the company did obtain the consent, in writing, of
the majority of the owners of the land (reckoning by the number
of lineal feet) fronting on both sides of said streets and avenues,
and did also obtain the consent of the mayor and aldermen of
the city of Paterson, which was duly granted at a meeting of the
board of aldermen held July 27th, 1868, and these averments
are verified by the affidavit annexed, and are not questioned or
denied by the affidavits presented by the defendants.

Counsel for the defendants, on the argument, presented a cer-
tified copy of the ordinance of the mayor and aldermen of the
city of Paterson, passed July 27th, 1868, certified under the seal
of the city clerk to be a true copy as made from the ordinance-
book.

By this ordinance it is provided—

"That it shall be lawful for the Paterson and Little Falls Horse Railroad Com-
pany to construct and lay in said city from the Van Winkle Street Bridge in
Van Winkle street, (now River Street), through Van Winkle Street to Bridge
Street and through Bridge Street to Broadway and through Broadway to West
Street, through West Street to Hamburgh Ave., to Union Ave. and through
Union Ave. to the line dividing the City of Paterson from the Township of
Manchester, such rail or rails for a horse railroad track or tracks and of such
style and width as are constructed, laid and used for horse railroad between
the Pavonia Avenue and Cortlandt Street Ferries in the city of Jersey City
in the State of New Jersey."

Counsel for defendants claim that the original charter of
1866 did not authorize the construction of a railroad through
River street; that by that charter a railroad was authorized to
be constructed from Paterson to Little Falls, and that by the
terms and provisions of that charter it is evident that the legis-
lature did not intend to incorporate a railroad in a municipality,
as it contains provisions for the condemnation of lands and for
the state taking the railroad on making compensation therefor;
that Little Falls was a village lying outside of the city of Pat-
erson, and that the whole legislative intent was to authorize a

road to connect the two places. While the act does contain some provisions which were usually inserted in special charters granted to railroad companies prior to the amendments to the constitution, it also expressly confers upon the company the right to construct its railroad from some point in, as well as near, the city of Paterson, and also along any street in said city, on obtaining the consent of the municipal authorities.

It is next urged that the consent given by the ordinance is only to construct and lay rails for a railroad to be operated in the city by horses.

The words " horse railroad track or tracks," used in the ordinance, must be taken as descriptive of the railroad to be constructed and not of the motive power to be used. Railways in the streets of cities, laid to conform with the grade of the streets, and properly known as street surface railroads, had by common usage been designated as horse railroads from the fact that they were for a long time operated exclusively by horses being attached thereto, and horse railroad and street surface railroad have come to be convertible terms. The ordinance granting the consent of the city, in using these words, used them as descriptive of the track which was commonly used in the construction of that kind of railroad, indicating the character of rail which would interfere as little as possible with the usual and ordinary use of the street by ordinary vehicles.

It is next claimed that the act of 1870 is void, because the object of the act is not expressed in the title. It was argued that the object of the act is to confer upon the company named in the title authority to construct and operate a railroad in certain streets in the city of Paterson solely, whereas the title of the act refers to a horse and steam railroad company between Paterson and Little Falls ; this idea is the result of construing the designation of a company by its name, as the statement of the object of the act in its title. The object of the act was to confer additional privileges upon the company which was originally incorporated by the act of 1866 under the name mentioned in the title to the supplement. It was no more necessary to refer in the title to all the powers to be given by the supplement than

it was to set out in detail every franchise granted to the corporation by its charter. The titles of such acts were generally nothing more than to incorporate a company, designating its corporate name. While it is true that no power could be granted by the supplement, which would have been unconstitutional if incorporated in the original act, that argument does not invalidate the supplement, because it would have been entirely competent for the legislature in 1866 to have granted, under the original act, the powers which are given by the supplement of 1870.

It is next claimed that this company has only the right to place a single track in any of the streets in the city of Paterson, but it is difficult to perceive how this could give the defendant the right to cut a wire which the company may have strung across the sidewalk in front of his property.

In my opinion the right of the complainant to operate a street surface railway in River street in front of Joseph C. Grundy's property is clear.

Has the complainant corporation the right to apply electricity by what is known as the overhead trolley system to the propulsion of its cars, and to erect and maintain the appliances necessary for the application of such power?

The question as to the absolute right of Joseph C. Grundy to cut the wires strung over his sidewalk by the complainant presents itself in a two-fold aspect, viz., his right as the owner of abutting property and his right as a citizen.

The complainant in this case has not placed upon the land in front of defendant's property any obstruction at all; his sidewalk is unencumbered, the posts are erected upon the lands of the owners of property on either side of his lot, and the only obstruction is the stringing of a wire twenty-odd feet above the curb line, in front of his lands, between these poles.

In considering the right of the defendant as an abutting owner to remove the wire, we assume, for the present, that the complainant has legislative sanction for the operation of its railway by the use of electrical force and its appliances, for if it has not, the defendant's right to clear the air of obstructions is as unques-

tionable as his right to clear the surface of the street in front of his property. If the contemplated use of the street by the complainant is authorized by statute, the defendant's rights therein are subservient thereto, unless such use imposes an additional servitude upon the land taken by the street fronting defendant's property or on his land abutting thereon.

The special rights of the abutting owner in the streets are *quasi* easements of access and light and air over the land of the street fronting his property. *Barnet* v. *Johnson, 2 McCart. 481; Dill* v. *Board of Education, 2 Dick. Ch. Rep. 441.* These he cannot be deprived of without compensation being made to him. *In re New York Elevated R. R. Co., 70 N. Y. 327; In re Gilbert Elevated R. R. Co., 70 N. Y. 361; Story* v. *New York Elevated R. R. Co., 90 N. Y. 122; Lahr* v. *Metropolitan Elevated R. R. Co., 104 N. Y. 268; Doucher* v. *Manhattan Elevated R. R. Co., 106 N. Y. 157; A. B. N. Co.* v. *N. Y. E. R. R. Co., 129 N. Y. 252.* These are interests distinct from those possessed by the general public and are rights appurtenant to the lot and the improvements thereon. *Decker* v. *Evansville, S. & N. Ry. Co. (Ind.), 33 N. E. Rep. 349.*

It is equally well settled that when a public use, authorized by law, takes no property of the individual, but merely affects him by proximity, the necessary interference in his business or in the enjoyment of his property occasioned by such use, furnishes no basis for damages. *Radcliff* v. *Mayor, 4 N. Y. 195; Bellinger* v. *Railroad Co., 23 N. Y. 42; Moyer* v. *Railroad Co., 88 N. Y. 351; Uline* v. *Railroad Co., 101 N. Y. 98; A. B. N. Co.* v. *N. Y. E. R. R. Co., supra.* The defendant's right to compensation, if any, springs, therefore, from his rights of adjacency, not from the fact of proximity; it must be an interference with some one of the rights of access or of light or air which, so far as the adjacent owner is concerned, hampers complete legislative control of the street for public use as a highway. The stringing of a single wire across and in front of the defendant's lots, twenty-two feet above the curb line, cannot seriously be said to be any substantial interference with his *quasi* easement of light and air. Of course, defendant's rights of adjacency over the sur-

face of the street are not impaired by the acts of the complainant. But the abutting owner has not only the right of ingress and egress in the accustomed manner; but also to have the way of access to the upper stories of his house kept free from obstructions which will prevent its use in emergent cases, such as fire, or which cannot be quickly displaced in such an emergency without serious danger to the person attempting their removal. The pleadings and affidavits before me, on this order to show cause, do not fairly present the question of fact, whether the "feed-wire" strung over defendant's curb line might not have been placed over the middle of the street without impairing its efficiency, nor what is the real danger, if any, in having it where it is now suspended. There can be no question that a privilege granted to a corporation of a partial use of the public highway, which threatens, if it does not encroach on, the property rights of the adjacent owner, should be so exercised by the company as to minimize the inconvenience and danger to the enjoyment of such rights. If it is not simply a question of expense, and the stringing of such an accessory to the electric railway as a feed-wire over the middle of the street instead of over the sidewalk, does not destroy or seriously impair its usefulness, and if the strength of the electrical current through it is so great that there is danger in handling such a wire in case it is necessary to quickly remove it, the company should be required to string it in the way attended with the least interference and danger to adjacent property, or, if that is impracticable, then to adopt mechanical appliances of safety, as "cut-outs," as were required by the chancellor in the case of *The Jersey City and Bergen Ry. Co.* v. *Jersey City*, 1891, not reported.

The bill in this case practically alleges that the appliances used by the company are those which are best adapted to the purpose, and the affidavits of the defendant only set up that the wire in question will interfere with the putting up of ladders in case of fire, or his desire to paint his house. There is also an apprehension of danger expressed. But it is only the opinion of the defendant. Whether he is qualified to pronounce a reliable opinion on the question or not does not appear, and the facts

in this case do demonstrate that this wire can be expeditiously and safely removed. We must, therefore, deal with the question of this wire without regard to the element of danger and consider it simply as a wire strung over defendant's sidewalk.

In *Lockhart* v. *Craig Street Ry. Co., 139 Pa. St. 419,* the judge says : " The placing of the wires over the streets does not appear to be a taking of plaintiff's property. The streets are dedicated to the public use, and he has certain special rights as an abutting owner, but I cannot see how a wire run through the air above the streets can be said to be a taking, injury or a destroying of his property." The distinction between the use of a street by telephone and telegraph companies and street railways, in this that the latter is, and the former is not, consistent with the character of a highway, is clear and is recognized in *Halsey* v. *Rapid Transit Co., 2 Dick. Ch. Rep. 380,* yet Chancellor Runyon, in *Roake* v. *American Telephone and Telegraph Co., 14 Stew. Eq. 35,* denied complainant a preliminary injunction to restrain the telegraph company from stringing wires over the street in front of his lands, on the ground that his right was not clear, as well as that the injury, if any, was not irreparable, but expressly disclaimed any intention to pass on the main question. He, however, does say : " The legislature of this state appears to have considered that the use of the street, so far as the wires are concerned, was not a violation of the rights of the owner of the soil in the streets, for, while it recognizes such rights as to the erection of poles, it does not do so as to the wires." *Hewitt* v. *Western Union Telegraph Co., 4 Mackey 424; McCormack* v. *District of Columbia, 4 Mackey 396,* were both applications for injunctions to restrain the putting up of a telegraph line along a street in Washington. These were refused because no irreparable injury was threatened, and that it could not be seriously contended that access or light or air were interfered with, and the danger and nuisance from the wires were very slight. Of course neither of these cases is exactly in point, but they are sufficient to show how shadowy is the right on which the defendant relies. In my opinion, the act of the complainant in stringing its wires in front of the defendant's lots, if

15

authorized by statute, was not such an invasion of defendant's rights of adjacency as to entitle him to compensation, and, consequently, he was not justified in removing it by reason of the fact that he was such abutting owner.

His right as a citizen, in common with all others, depends on the question whether the occupation of a part of the street by the complainant was without lawful authority, and, as such, a nuisance which any one could abate.

Complainant claims the right to use the overhead trolley system in the application of electricity to its cars as a motive power, from the original charter of 1866 and the supplement of 1870, as well as by the act of 1886 and the consent of the city authorities of Paterson.

By section 16 of the original charter of 1866, it is provided

"that the said company shall have power to construct or have constructed, or to purchase with the funds of said company, and place and use on said railway or any part thereof, cars, engines, wagons, carriages or vehicles for their own use, or for the transportation of passengers or any species of property, for hire, *to be operated by such motive power as they may deem expedient and proper.*"

And by section 2 of the supplement of 1870, it is provided

"that in the construction, equipment, management, running and operation of said railroad, the said company shall have and possess all the powers, authority and privileges granted to and conferred upon them by the act to which this is a supplement."

The right of the legislature over the public highways and to grant the use thereof for the public convenience and travel, so long as it does not impose additional servitudes upon the property, and does not materially obstruct the public use by ordinary and accustomed methods, is undoubted. *Domestic Telephone and Telegraph Co.* v. *Newark, 20 Vr..344–346.* Its power to authorize the erection of lamp posts, water plugs and fire telegraph poles on the public highways has never been questioned; they are for the public advantage, and their occupation of the surface of the ground, and consequent inconvenience, is infinitesimal.

In this case the grant is not the right to use steam *or* horses in

Paterson Railway Co. *v.* Grundy.

the operation of their cars, but *any* motive power they may deem expedient and proper; it has but one limit, and that is the discretion and judgment of the company, to be regulated, of course, by the controlling rule that the means adopted shall not obstruct the public use in its accustomed way. Nor do I think this power is limited to the methods known or in practical use at the time of the grant. Practically, these were confined to animal and steam power. If the grant had been to use a specific power, in known use, in a particular way—if they deemed it expedient and proper—there might be strength in the argument that it did not authorize such method in another way, which required other and additional use of property, but here the grant of authority is as ample as words can make it, and would seem to embrace not only known systems or ways of propulsion but all improvements which science and ingenuity might devise, subject to the conditions before specified.

In *Hudson River Telephone Co.* v. *Watervliet Turnpike and Ry. Co., 135 N. Y. 393,* in the New York court of appeals, a similar question arose. The defendant company, by act of 1862, were authorized to use "the power of horses, animals, or any mechanical or other power, or the combination of them, which the said company may choose to employ, except the force of steam." On its right to use the trolley system in the application of electricity for the traction of its cars the court says : "The act of 1862 cannot be properly limited to such methods of operating street surface railways in cities as had then been invented and were then in actual use. The words of the statute are to be interpreted according to their natural and obvious meaning, and, as the terms employed are not ambiguous, extrinsic facts are not available to restrict the authority which it plainly confers. The language, literally construed, includes undiscovered as well as existing modes of operation. Electricity, as a natural and applied force, was then well known, and it is reasonable to infer that its adoption as a propelling power was even then anticipated. It would be an unjust reflection upon the wisdom and intelligence of the law-making body to assume that they intended to confine the scope of their legislation to the

present, and to exclude all consideration for the developments of the future. If any presumption is to be indulged in, it is that general legislative enactments are mindful of the growth and increasing needs of society, and they should be construed to encourage, rather than to embarrass the inventive and progressive tendency of the people." See, also, *Taggart* v. *Newport Street Ry. Co., 16 R. I. 668 ; Williams* v. *Street Ry. Co., 41 Fed. Rep. 556 ; Macomber* v. *Nichols, 34 Mich. 212 ; Detroit City Ry. Co.* v. *Mills, 85 Mich. 634.*

The bill also avers that, by an ordinance passed by the board of aldermen of the city of Paterson, on the 6th day of October, 1890, approved by the mayor on the 10th of October, 1890, the complainant was authorized to use electric motors as the propelling power of their cars, an averment which is verified by the affidavits annexed to the bill, and is neither controverted nor denied by the papers presented by the defendant. The authority to pass this ordinance is claimed to be derived from the act of March 6th, 1886, entitled " Concerning street railroad corporations." *Rev. Sup. p. 369.* The right of a street surface railroad company under this act, and such consent to use electric power and maintain the proper accessories thereto, for the propulsion of its cars, is, so far as this court is concerned, settled by the case of *Halsey* v. *Rapid Transit Street Ry. Co., 2 Dick. Ch. Rep. 380,* and by that decision, the right of the complainant to erect its appliances for the application of this power for the movement of its cars, would seem to be clear under the rights which have been granted to it by the legislature and the authority of the city of Paterson. The views of the vice-chancellor in that case are sustained by the decision in Rhode Island of *Taggart* v. *Newport Street Ry. Co., supra ;* in Ohio, in *Mt. Adams & E. P. I. Ry. Co.* v. *Winslow, 3 Ohio Cir. Ct. Rep. 428,* and in *Pelton* v. *East Cleveland R. R. Co., 22 W. L. B. 67 ;* in Kentucky, *Louisville B. M. Co.* v. *City Passenger Ry. Co.,* decided June 30th, 1890 ; in Michigan, in *Detroit City Ry. Co.* v. *Mills, 85 Mich. 634 ;* in Pennsylvania, in *Lockhart* v. *Craig Street Ry. Co., 139 Pa. St. 419 ;* in Maryland, in *Koch* v. *Railway Co., 75 Md. 222 ;* and in United States circuit court, in *Williams* v. *Street Ry. Co., 41 Fed. Rep. 556.*

See, also, consideration of the question and cases in *Keasb. Elec. Wires S. & H. ch. X.*

The legislature, by the fifth section of an act creating a state board of commissioners of electrical subways, approved March 10th, 1892 (*P. L. of 1892 p. 78*), enacted—

"That no telegraph, telephone, electric light or other electric wire or cable shall hereafter be constructed along, across or above the surface of any street or avenue in any city of this state, until the board created by this act shall, by the votes of a majority of its members, authorize such wires to be carried along, across or above the surface of such streets or avenues ; *provided*, that this section shall not be *constructed* [sic] to apply to the repair of wires now in use, or to wires owned by *any* [sic] of this state, or used for fire or police purposes therein."

This statute was approved prior to the attempt on the part of the complainant to string its wires above the street in front of the defendant's property. There is no averment in the bill that the consent of the subway commission had been obtained by the complainant, nor is want of such authority set up in the answer. The statute, however, is a public statute, operating over the whole state and affecting every city therein. No private corporation can possibly enjoy the right to use the public highways except by legislative sanction, and if the legislature has imposed conditions on all claiming such legislative authority, as it affects the interests of the public, it would be the duty of the court to apply the test imposed by the latest legislation, whether the parties pleaded it or not. The point that the question is not raised by the pleadings was, however, not strenuously urged, as counsel frankly stated it was a matter easily reached by amendment, if necessary.

This section, unaffected by the proviso, unquestionably imposed a new condition on all parties intending to string electric wires above the surface of any street or avenue in any city in the state. No question was, or can be, made as to the power of the legislature to impose new limitations, on any previous concession of authority to the complainants to partially use the highways of the state. It is claimed, however, that the rights of the complainant are not affected by the section in question, because it is

unconstitutional, as not being within the scope and provision of the title of the act. The title is "An act providing for the placing of electrical conductors under ground in cities of this state, and for the creation of a board of commissioners of electrical subways." It is urged that the object of the law, as gathered from the title, is to provide for the placing of wires *under* ground, and for the creation of a board to do that specified thing; that it might have been competent to have enlarged the · scope of the title to regulate the placing of wires generally, but that it had not done so and limited it to subway wires and a subway commission. But the single general object of the law, as gathered from its title and provisions, undoubtedly, is to require electric wires occupying the streets or avenues of a city, sooner or later, to be placed underground. The commission is the means by or through which this object is to be accomplished, and that no hardship be occasioned by an abrupt termination of all right or license to string wires in cities, the commission is authorized to permit it being done. While not clearly so, this seems to me to be germane to the object of the law as stated in the title, and fairly within the rule laid down in the authorities which are cited by the chancellor in *Stockton* v. *Central R. R. Co., 5 Dick. Ch. Rep. 52.*

It is also claimed that the section itself does not by its terms render it necessary for the complainants to obtain the consent of the commissioners. There are two obvious errors in the proviso of section 5, as it appears in the pamphlet laws, which, it is said, also exist in the original on file in the secretary of state's office. The word "constructed" has evidently been substituted or used for the word "construed," and there is a palpable omission after the word "any." No great difficulty arises from the first, but the other undoubtedly raises some very plausible auggestions.

It is first argued that, in construing this section, it is not allowable to inquire whether the legislature intended to put some word after the word "any," nor to interpolate such word, even if it is evident what it should be. To the latter proposition I yield an unhesitating assent. You cannot go outside the law to ascertain the intent of the legislature, nor can you supply

words to make it conform to what you understood the meaning of the legislature to be.  But I think it is competent, when a construction is sought to be placed upon the words of the act, to ascertain whether it is not apparent, from the context, that there has been some word omitted, which fact itself will negative the construction sought to be given—not by supplying a word to give some other construction, but deducing from the fact of omission that the proposed construction is not correct.  This does no violence to the rule that the legislative intent must be gathered from the act itself.  Counsel argues that "any" is here used as a pronoun, and when used in this sense, has a most comprehensive signification; that, construed with that to which it applies—which, it is argued, is that which immediately precedes, namely, "wires owned"—it must be held to mean any one capable of ownership, individual or corporate, and numerous examples of such comprehensive use of the word by itself, are cited.  It is, however, to be noted that such extended sense of the word is, in such cases, derived from the context, and that the sentence or paragraph is complete as it stands.  On reading this proviso, however, the first impression is that some word has been omitted—its incompleteness is at once manifest—but if the construction contended for is correct, the only word which would comprehend it would be "one," making it read "any one." Such construction, however, would render nugatory the whole section, and cannot be adopted.  It is apparent, I think, that the omitted word is "city," but I agree with counsel that we cannot, by judicial construction, interpolate it.  The difficulty, however, arises with only one division of the proviso; two others are complete and operative; the proviso enacts that the section shall not apply to the repair of wires now in use; there is no obscurity so far; it is not necessary to obtain the consent of the subway commission to string wires in a city if it is done in repairing wires now in use, nor is it for wires used for fire or police purposes therein; "therein," from the context, must relate to "state;" there is also the sentence under consideration, "or to wires owned by any of this state."  It seems to me impossible to give any satisfactory meaning to those words, taken in

connection with the context. But, is the whole section, on that account, to be disregarded? I think not. The provision of the section requiring the consent of the commission is perfectly clear. There is no doubt, from the proviso, that it is not to apply to the repair of wires now in use, or to wires used for fire or police purposes. Thus far, the meaning of the legislature is distinct. It appears they meant to except some other wires, but, for want of apt words, they have failed to indicate what. It cannot be presumed it was a class which would embrace the complainant; but, as we cannot, from the words, give it a satisfactory application, it is to be disregarded. The rest of the section is not affected by such course. The complainant's right to an injunction, in my opinion, would be complete but for the act of 1892. But if it is even doubtful whether the act is or is not constitutional, or whether it applies to the complainant, it is fatal to this application, for this court will not grant a preliminary injunction on a questionable point of the constitutionality of a statute, or its applicability to a party. *Inhabitants of Greenville* v. *Seymour, 7 C. E. Gr. 458 ; Bonaparte* v. *Camden and Amboy R. R. Co., Bald. 205 ; Hackensack Improvement Co.* v. *New Jersey Midland Ry. Co., 7 C. E. Gr. 94 ; Morris and Essex R. R. Co.* v. *Prudden, 5 C. E. Gr. 530 ; Black* v. *Camden and Amboy R. R. Co., 7 C. E. Gr. 130, 131.*

The order to show cause must be discharged.